STATE OF NEBRASKA, APPELLEE, V. BRET EWING, ALSO KNOWN AS
BRET ESAU, APPELLANT.

378 N.W.2d 158

Filed December 13, 1985.   No. 85-130.

Richard T. Vanderheiden of Phares, Torpin, Vanderheiden & Mesner, for appellant.

Robert M. Spire, Attorney General, and Calvin D. Hansen, for appellee.

KRIVOSHA, C.J., BOSLAUGH, WHITE, HASTINGS, CAPORALE, SHANAHAN, and GRANT, JJ.

GRANT, J.

The defendant-appellant, Bret Ewing, also known as Bret Esau, age 17, was charged in the county court for Merrick County, Nebraska, with false reporting "with the intent . . . to impede the investigation of an actual criminal matter" in violation of Neb. Rev. Stat. § 28-907(1)(a) (Cum. Supp. 1984). After trial Ewing was found guilty as charged and was sentenced to unsupervised probation for a 31-day period, during which time he was required to complete 15 hours of community service work with the Central City Police Department. On appeal to the district court for Merrick County, Ewing's conviction and sentence were affirmed. Ewing appeals to this court, assigning as error that the trial court erred by inferring the intent required by § 28-907(1)(a) on Ewing's part and in determining that an "actual criminal matter" was being investigated. For the reasons hereinafter set out, we affirm.

On the afternoon of May 15, 1984, Angela Marti, age 16, received permission from her mother to visit a friend, Tanya Dubey, who lived in a trailer home about 10 blocks from the Marti home in Central City, Nebraska. The trailer home that Angela sought to visit was rented and occupied by Valerie Shanklin, age 21 or 22, and Tanya Dubey, age 16, who was either a stepsister of Valerie's or about to become one.

Angela was instructed by her mother to return home by dark. She did not do so. At 9 p.m. Mrs. Marti went to the trailer home, where she found her daughter, Valerie Shanklin, Tanya Dubey, defendant Bret Ewing, and Bill Zikmund, age 17, in the trailer. Mrs. Marti saw Ewing and Angela sitting at a table with

a beer can on the table in front of each of them. When asked by her mother about the beer, Angela said that it was Tanya's. Angela had a cigarette in her hand.

When Mrs. Marti asked her daughter what was going on, Ewing told Mrs. Marti not to get upset, that "it was just a cigarette." Mrs. Marti then asked her daughter to come home. Angela refused and a heated argument ensued. Mrs. Marti told her daughter to be home in 15 minutes and that if she did not do so, she (Mrs. Marti) would call the police. Ewing testified he was present when Mrs. Marti and Angela were arguing in the trailer and that he also could hear the two arguing in the alley after they both left the trailer.

When Angela did not return home as directed, Mrs. Marti called the Central City Police Department at approximately 10 p.m. Officer William Fitzgerald was sent to speak with Mrs. Marti. She told Fitzgerald that her daughter and other juveniles were at the trailer. She also said that there were "beer cans and cigarettes and other things involved and she just didn't like that atmosphere that her daughter was in." When called as a witness by Ewing, Mrs. Marti further testified that she told Officer Fitzgerald that her 9-year-old daughter had returned home earlier and told her mother that she had seen drinking going on at the trailer. Mrs. Marti further testified that she told the officer that "I had reason to believe that there was drinking going on in the house with minors. I did not want my daughter in that environment." She asked Officer Fitzgerald to "go over to the house and check for her."

Officer Fitzgerald went over to the trailer at approximately 10:15 p.m. and spoke only with Tanya Dubey. Dubey denied that Angela Marti was in the trailer. Angela Marti testified that she was in the trailer at that time. Fitzgerald left the scene without having seen or spoken with Ewing.

Fitzgerald then returned to Mrs. Marti's residence and told her he was unable to locate her daughter. Mrs. Marti suggested that Fitzgerald drive by the trailer to see if Angela's bicycle was there. Fitzgerald did so and saw the bicycle in front of the trailer. Officer Fitzgerald then radioed his superior officer, Sergeant Koss, explaining that he was unable to locate the Marti

girl. Koss told Fitzgerald there was not much more he could do.

The radio transmission between Fitzgerald and Koss was overheard by State Patrolman Ronald McGuire, who was on the west edge of Central City. McGuire went to Mrs. Marti's residence, where Mrs. Marti and Officer Fitzgerald were present. McGuire testified that he was informed by Mrs. Marti that her daughter was 16, that there was "booze" present in the trailer, that her daughter was smoking, and that she (Mrs. Marti) had met with resistance in removing her daughter from that environment.

Officer McGuire also testified he decided to investigate because it was his opinion that there was a possibility of a minor in possession of alcohol. He further testified he felt, based upon the information Mrs. Marti had given him, "that there may be a delinquent minor along with maybe somebody contributing to the delinquency of a minor." Contributing to the delinquency of a minor, as defined by Neb. Rev. Stat. § 28-709 (Reissue 1979), is a Class I misdemeanor, and possession of alcohol by minors is a violation of Neb. Rev. Stat. § 53-180.02 (Reissue 1984).

Officer McGuire, along with Mrs. Marti and Officer Fitzgerald, then went over to the trailer at about 11 p.m. McGuire testified he approached the trailer, knocked on the door, and Dubey, Ewing, and Zikmund came out on the front porch. McGuire asked Ewing several times during the conversation if the Marti girl was in the trailer house. Ewing responded that Angie was not in the trailer, that she had left. Ewing later testified that he, in fact, knew Angela Marti was hiding in the trailer at the time. McGuire testified that he smelled alcohol coming from Ewing and Zikmund. After failing to find Angela Marti and having been refused admittance to the trailer, McGuire, Mrs. Marti, and Fitzgerald left.

Angela Marti testified that, once the officers and Mrs. Marti left, she, Dubey, Ewing, and Tony Davis all went over to Davis' house. Mrs. Davis later came home. Defendant's mother was with Mrs. Davis, apparently looking for her son, the defendant, because Ewing testified he also was hiding from his mother that evening. Angela also testified she had a fight with Mrs. Davis.

According to Officer McGuire's police report, both Mrs. Davis and defendant's mother went down to the police station and told the police where they could find the youths. The police arrived at the Davis home around 1 a.m. All of the youths scattered, but the police did apprehend Ewing.

Angela Marti did not return to her home that night and spent the night in a shed. She went to school the following morning and later called her mother.

After trial the county court found Ewing guilty. In its judgment the county court found:

> In this case, there was a possible criminal charge of contributing to the delinquency of a minor under R.R.S. Neb. 28-709. Whether or not the investigating officers intended to ask the county attorney to file such a complaint is immaterial in relation to the application of R.R.S. Neb. 28-907.

In effect, the court determined that when Officer McGuire questioned the appellant concerning the whereabouts of Angela Marti on May 15, 1984, McGuire was investigating an actual criminal matter pursuant to § 28-907(1)(a).

Section 28-907(1)(a) states:

> (1) A person commits the offense of false reporting if he or she:
>
> (a) Furnishes information he or she knows to be false to any peace officer or other official *with the intent* to instigate an investigation of an alleged criminal matter or *to impede the investigation of an actual criminal matter*.

(Emphasis supplied.)

Section 28-907(1)(a) requires three elements be present in order to be convicted of false reporting. There must be a false statement to a peace officer; it must be given with the intent to impede an investigation; and the investigation must be of an actual criminal matter. Ewing admits that he lied to the police when questioned as to Angela Marti's whereabouts on May 15, 1984. His two assignments of error are that the trial court erred in determining that he possessed the requisite intent to impede an investigation and in determining that the police were investigating an actual criminal matter.

We agree with Ewing that the phrase "actual criminal

matter" has never been defined in Nebraska case law, statute, or legislative history. A review of other states' false reporting statutes and case law also indicates that Nebraska is the only state which uses the words "actual criminal matter" in conjunction with its false reporting statute.

Interpreting a statute is a question of law. The general overriding principle of statutory construction as it relates to a penal statute is that the penal statute be strictly construed. *State v. Suhr*, 207 Neb. 553, 300 N.W.2d 25 (1980). However, a criminal statute should also be construed in the context of the object sought to be accomplished, the evils and mischiefs that are sought to be remedied, and the purposes for which it serves. A statute should be given a sensible construction. *State v. Lewis*, 184 Neb. 111, 165 N.W.2d 569 (1969). Additionally, while a penal statute must be strictly construed, it is not proper to give it a strained or unnatural construction. *State v. Reich*, 186 Neb. 289, 183 N.W.2d 223 (1971), *cert. denied* 404 U.S. 846, 92 S. Ct. 149, 30 L. Ed. 2d 83. The rule requiring strict construction of penal statutes is not violated by giving words of the statute their full meaning in the connection in which they are employed. *State v. Simants*, 182 Neb. 491, 155 N.W.2d 788 (1968).

As noted earlier, although the phrase "actual criminal matter" has never been interpreted, this court recently discussed the underlying purpose of § 28-907(1)(a) in *State v. Fix*, 219 Neb. 674, 679, 365 N.W.2d 471, 475 (1985), where we noted:

> The law enforcement department for this community is extremely small. The record indicates that it consisted of only two officers, one working days and one working nights. Because of the statement made by Fix, the one officer was required to occupy his entire evening investigating the allegedly missing money and was taken away from his real purpose, that of patrolling the community during the night hours.

While *Fix* was a case that dealt with the furnishing of false information to a police officer with the intent to instigate an investigation of an alleged criminal matter, we believe the same reasoning applies where one impedes the investigation of an

actual criminal matter. The underlying purpose of § 28-907(1)(a) is to prevent the public from willfully furnishing erroneous information to law enforcement officers and thus interfering with the performance of their duties.

Ewing argues that in order for § 28-907(1)(a) to apply there must be an actual crime committed. We do not read the statute so. If the Legislature intended that an investigation of an actual crime be the subject of the official investigation, then it would have simply used the word "crime." The fact of the matter is it did not, and instead used the phrase "actual criminal matter," which is a broader term.

In using the words "actual criminal matter," the Legislature intended that law enforcement officers be required to prove the existence of a legitimate and valid investigation of facts which could constitute a predicate offense before a violation of the false reporting statute may stand. This would be a reasonable construction, given the abuses the statute is intended to prevent. It would protect the public from being harassed by police officers asking questions concerning a feigned or false criminal matter. The word "actual" adds an element of objectivity to ensure that before a person is questioned concerning a criminal matter, the police must be able to point to particular facts and circumstances which would lead a reasonable person to believe that criminal activity was afoot.

In this case the information given to Officer McGuire concerning the activity in the trailer house was by an eyewitness, Mrs. Marti. Mrs. Marti told McGuire that she saw her daughter and Ewing sitting at a table. There were beer cans on the table. Mrs. Marti was told by her daughter that the beer belonged to Tanya, another 16-year-old. She indicated the age of her daughter. She also told him that she had had trouble removing her daughter from this trailer. When presented with these facts and the late hour that Angela was absent from her home on a school night, it was certainly reasonable for Officer McGuire to believe that a minor could be in the possession of alcohol and that someone could be contributing to the delinquency of a minor. Officer McGuire acted within the ambit of § 28-907(1)(a).

Ewing's second assignment of error is that the trial court

erred "by inferring knowledge and intent on [his] part . . . in impeding the investigation of an actual criminal matter from the circumstances surrounding the false information told to the police officers . . . ."

Ewing argues that the evidence was insufficient to find that he had formed the requisite intent to impede an investigation. In support of this proposition he argues that if intent is to be shown by circumstantial evidence, the circumstantial evidence proven must relate directly to the guilt of the accused beyond all reasonable doubt in such a way as to exclude any other reasonable conclusion. We have held that any fact or circumstance reasonably susceptible of two interpretations must be resolved most favorably to the accused. *State v. Doyle*, 205 Neb. 234, 287 N.W.2d 59 (1980).

We held in *State v. Buchanan*, 210 Neb. 20, 312 N.W.2d 684 (1981), that one accused of a crime may be convicted on the basis of circumstantial evidence if, taken as a whole, the evidence establishes guilt beyond a reasonable doubt. The State is not required to disprove every hypothesis but that of guilt.

As stated in *State v. Schroder*, 218 Neb. 860, 869, 359 N.W.2d 799, 806 (1984):

[I]n determining the sufficiency of the evidence to sustain a conviction, it is not the province of this court to resolve conflicts in the evidence, pass on the credibility of witnesses, determine the plausibility of explanations, or weigh the evidence. Such matters are for the finder of fact. The verdict must be sustained if, taking the view most favorable to the State, there is sufficient evidence to support it.

With regard to the question of the determination as to the required intent, we held in *State v. Journey*, 201 Neb. 607, 616, 271 N.W.2d 320, 325 (1978): " 'The intent with which an act is done is inferable from the act itself, and from the facts and circumstances surrounding it. * * * But it is sufficient in such cases to prove facts from which the specific intent may be inferred. . . .' "

We believe the standards set forth in *Schroder*, *Buchanan*, and *Journey* have been met by the State in this case.

The record shows that Ewing was present when Mrs. Marti

asked her daughter to come home. Ewing witnessed the argument between the two. He knew there was beer in the trailer and that Mrs. Marti had been told that Tanya Dubey, a 16-year-old girl, had beer in her possession. Ewing was also aware that Tanya had lied about Angela's whereabouts when questioned by the police the first time. With this in mind he purposefully lied to the police when questioned about Angela Marti.

Ewing argues that the police never informed him that they were investigating a criminal matter, and, therefore, he could not form the requisite intent to impede such investigation. The facts in this case do not support Ewing's contention. Ewing knew that efforts were being made to hide Angela from the police and that a situation existed which raised a question about possibly contributing to her delinquency. Ewing had personal knowledge of the legal ramifications resulting from the drinking of alcohol by minors. Ewing testified that he had gotten drunk the year before at a school dance when he was a junior in high school and had been taken to the police station in Central City, where he got "really mouthy" with Officer McGuire "because I was so drunk I didn't remember what he was saying to me . . . ." Ewing certainly did not need to be apprised specifically by the police that an investigation was taking place.

We note that Ewing had two options when asked about the location of Angela Marti. He could have remained silent, as constitutionally privileged, or told the truth. In either case he could not have been charged under the false reporting statute. But, rather, he chose to lie. We can conclude that he affirmatively intended to impede the officer's investigation. The conviction and sentence are affirmed.

AFFIRMED.

KRIVOSHA, C.J., dissenting.

I must respectfully dissent from the majority opinion in this case. As the majority notes, before one may be found guilty of violating Neb. Rev. Stat. § 28-907(1)(a) (Cum. Supp. 1984), three elements must be present: (1) there must be a false statement to a police officer; (2) the statement must be given with the *intent* to impede an investigation; and (3) the investigation must be of an *actual* criminal matter. Although it

is obvious that a false statement was made to a police officer, I do not believe that the evidence in this case will permit a finder of fact to conclude that the second and third elements of the crime have been established beyond a reasonable doubt.

As noted by the majority, there was no investigation of an actual criminal matter going on, at least as long as Officer Fitzgerald was involved. When he radioed his superior officer, Sergeant Koss, explaining that he was unable to locate the Marti girl, he was told that there was not much more he could do. No one intended to conduct any further investigation or do anything more about the matter.

Therefore, in order to find that there was an investigation of an actual criminal matter which was impeded, one must find that somehow the activity of Trooper McGuire constituted such an investigation. In my view the evidence will not support that conclusion. Trooper McGuire testified that after he overheard the conversation between Officer Fitzgerald and Sergeant Koss, he drove over to Bolling's trailer court, where he met Mrs. Marti. His purpose of taking Mrs. Marti into his cruiser and going to the Shanklin trailer was simply to get Mrs. Marti's daughter. Specifically, he was asked the following questions and gave the following answers: "Q- What did you do at that time? A- I told her [Mrs. Marti] if she wanted her daughter home to get in my patrol car, we'd go get her daughter."

When specifically asked what actual crimes he was investigating, he answered:

> From what Mrs. Marti had described and the environment she had described, I felt that there was a *possibility* of her daughter being a minor in possession of alcohol. I also felt that if — was fact what she had described in the confrontation that she had with the other people in the trailer house and the environment, that there may be a delinquent minor along with maybe somebody contributing to the delinquency of a minor.

(Emphasis supplied.) Further, on cross-examination Trooper McGuire testified:

> The reason I went over to Tanya Dubey's was to assist Mrs. Marti in returning her child to her home. The information that Mrs. Marti gave me put information into my head that in fact, *after* I got to that trailer house, there may be

crimes being committed.
(Emphasis supplied.)

On the basis of that testimony, I find it difficult to conclude beyond a reasonable doubt that there was an investigation of an actual criminal matter taking place. This is, in my view, further supported by the fact that no one was charged with being a minor in possession or contributing to the delinquency of a minor.

Section 28-907(1)(a) also mandates that the statement must be given with the intent to impede an investigation. The record is, however, devoid of any evidence indicating that Ewing either knew or should have known that Trooper McGuire was conducting an investigation of "an actual criminal matter." The majority suggests that he should have known that there was the *possibility* that someone was guilty of being a minor in possession or of contributing to the delinquency of a minor. I am unable to equate "possibilities" with the need that the defendant have an intent to impede an investigation of an "actual criminal matter" before one may be guilty of violating § 28-907(1)(a). Ewing might just as well have concluded that the trooper had come to secure custody of a runaway, as the trooper in fact told Mrs. Marti he was doing, and was not at all concerned about a criminal investigation. It would seem that a person must know, or should have known, that an investigation of an actual criminal matter is being conducted before a person can intend to impede that investigation by giving false information. Here, even the majority admits that there was only a possibility that Ewing knew or should have known that an actual criminal investigation was ongoing. It does not seem to me to be too onerous a burden to require a police officer to advise persons who are being interrogated that the officer is in the process of conducting an investigation of an actual criminal matter. In my view the record does not establish the requisite intent necessary to constitute the crime charged.

Ewing is not to be commended for lying, but the fact that he committed a moral sin does not equate to establishing proof beyond a reasonable doubt of the commission of a criminal act.

CAPORALE, J., joins in this dissent.