Nebraska Accountability and Disclosure Commission,
appellant, v. Rolland Skinner, appellee, and
Northwest Rural Public Power
District and Gary Fuchser,
intervenors-appellees.

Nebraska Accountability and Disclosure Commission,
appellant, v. Les Tlustos, appellee, and
Northwest Rural Public Power
District and Gary Fuchser,
intervenors-appellees.

___ N.W.2d ___

Filed August 15, 2014.    Nos. S-13-389, S-13-390.

1. **Administrative Law: Judgments: Appeal and Error.** A judgment or final order rendered by a district court in a judicial review pursuant to the Administrative Procedure Act may be reversed, vacated, or modified by an appellate court for errors appearing on the record.

2. ____: ____: ____. When reviewing an order of a district court under the Administrative Procedure Act for errors appearing on the record, the inquiry is whether the decision conforms to the law, is supported by competent evidence, and is neither arbitrary, capricious, nor unreasonable.

3. **Administrative Law: Appeal and Error.** In an appeal under the Administrative Procedure Act, an appellate court will not substitute its factual findings for those of the district court where competent evidence supports the district court's findings.

4. **Administrative Law: Statutes: Appeal and Error.** To the extent that the meaning and interpretation of statutes and regulations are involved, questions of law are presented, in connection with which an appellate court has an obligation to reach an independent conclusion irrespective of the decision made by the court below.

5. **Criminal Law: Statutes.** Penal statutes are considered in the context of the object sought to be accomplished, the evils and mischiefs sought to be remedied, and the purpose sought to be served.

6. ____: ____. Effect must be given, if possible, to all parts of a penal statute; no sentence, clause, or word should be rejected as meaningless or superfluous if it can be avoided.

7. ____: ____. The rule requiring strict construction of penal statutes is not violated by giving words of the statute their full meaning in the connection in which they are employed.

8. **Statutes: Legislature: Intent.** In discerning the meaning of a statute, a court must determine and give effect to the purpose and intent of the Legislature as ascertained from the entire language of the statute considered in its plain, ordinary, and popular sense, it being the court's duty to discover, if possible, the Legislature's intent from the language of the statute itself.

9. ____: ____: ____. The intent of the Legislature may be derived from both the words that it used in a statute and those that it did not.
10. **Statutes: Appeal and Error.** In the absence of a statutory indication to the contrary, an appellate court gives words in a statute their ordinary meaning.
11. **Judgments: Appeal and Error.** An appellate court reviewing for errors appearing on the record does not make factual determinations that should be made by the finder of fact.
12. **Administrative Law: Judgments: Appeal and Error.** Although a district court in its de novo review of agency determinations is not required to give deference to the findings of fact by the agency hearing officer, it may consider the fact that the hearing officer, sitting as the trier of fact, saw and heard the witnesses and observed their demeanor while testifying and may give weight to the hearing officer's judgment as to credibility.
13. **Appeal and Error.** An appellate court may, at its discretion, discuss issues unnecessary to the disposition of an appeal where those issues are likely to recur during further proceedings.
14. **Constitutional Law: Statutes: Proof.** It is firmly established as the universal rule that a person may attack the constitutionality of a statute only when and so far as it is being or is about to be applied to his disadvantage; and to raise the question, he must show that the alleged unconstitutional feature of the statute injures him and so operates as to deprive him of a constitutional right, and, of course, it is prerequisite that he establish in himself the claimed right which is alleged to be infringed.

Appeals from the District Court for Lincoln County: DONALD E. ROWLANDS, Judge. Reversed and remanded for further proceedings.

Neil B. Danberg, Special Assistant Attorney General, for appellant.

Terry Curtiss, of Curtiss, Moravek & Curtiss, P.C., L.L.O., for appellees.

David A. Jarecke and Vanessa A. Silke, of Blankenau, Wilmoth & Jarecke, L.L.P., for intervenors-appellees.

HEAVICAN, C.J., WRIGHT, CONNOLLY, STEPHAN, MCCORMACK, MILLER-LERMAN, and CASSEL, JJ.

WRIGHT, J.

## I. NATURE OF CASE

The Nebraska Accountability and Disclosure Commission (Commission) appeals the order of the district court which

reversed the Commission's finding that two employees of Northwest Rural Public Power District (NRPPD) violated the Nebraska Political Accountability and Disclosure Act (Act), Neb. Rev. Stat. §§ 49-1401 to 49-14,141 (Reissue 2010) (subsequent amendments to Act are not applicable to instant case).

The question presented is whether the employees used public resources for the purpose of campaigning against a candidate for NRPPD's board of directors (Board). The employees purchased short radio advertisements on the subjects of wind energy, "generation duplication," and electricity rates that were broadcast before the November 2, 2010, general election. We reverse the judgment of the district court and remand the cause for further proceedings consistent with this opinion.

## II. SCOPE OF REVIEW

[1,2] A judgment or final order rendered by a district court in a judicial review pursuant to the Administrative Procedure Act may be reversed, vacated, or modified by an appellate court for errors appearing on the record. *J.P. v. Millard Public Schools*, 285 Neb. 890, 830 N.W.2d 453 (2013). When reviewing an order of a district court under the Administrative Procedure Act for errors appearing on the record, the inquiry is whether the decision conforms to the law, is supported by competent evidence, and is neither arbitrary, capricious, nor unreasonable. *J.P., supra*.

[3,4] In an appeal under the Administrative Procedure Act, an appellate court will not substitute its factual findings for those of the district court where competent evidence supports the district court's findings. *AT&T Communications v. Nebraska Public Serv. Comm.*, 283 Neb. 204, 811 N.W.2d 666 (2012). But "[t]o the extent that the meaning and interpretation of statutes and regulations are involved, questions of law are presented, in connection with which an appellate court has an obligation to reach an independent conclusion irrespective of the decision made by the court below." *Liddell-Toney v. Department of Health & Human Servs.*, 281 Neb. 532, 536, 797 N.W.2d 28, 31 (2011).

## III. FACTS

NRPPD is a political subdivision created under Neb. Rev. Stat. § 70-602 (Reissue 2009). At all times relevant to this case, Rolland Skinner was the general manager of NRPPD and Les Tlustos was the consumer services director. Both were considered public employees subject to the Act.

Skinner and Tlustos were responsible for NRPPD's radio advertisements, including public service announcements. Tlustos wrote the advertisements and determined how they should be distributed. Skinner provided general supervision and approved some of the advertisements before they were distributed, but not all.

The focus of NRPPD's radio advertisements was to "make [NRPPD's] consumers aware of what things were happening within the electric industry" and to assist consumers "in utilizing their resources productively." Throughout 2010, there were advertisements on the efficient use of energy, how to choose high efficiency equipment, energy efficiency credits, energy consumption from appliances and lights, "TogetherWeSave.com," and "[g]etting the most value from your energy dollar." Some advertisements discussed the benefits of using surge protectors, electric heat pumps and water heaters, electric grills, space heaters, and programmable thermostats. In 2010, other advertisements explained services provided by NRPPD, such as the "Youth Energy Camp" and the "Diggers Hotline."

In April 2010, Michael Van Buskirk announced his candidacy for a seat on the Board. The incumbent was the only other candidate for that seat. Between April 12 and 16, Van Buskirk spoke at a public meeting of the Sheridan County commissioners, appeared on a local radio station, and was the subject of an article in the county newspaper. Through these mediums, Van Buskirk touted wind energy as a viable method of containing energy costs and encouraging economic development. He criticized the existing Board for being unsupportive of local attempts to use wind power and for enacting policies that would "basically eliminate our potential to explore wind power within Sheridan County." He also opposed the existing Board's decision to join a lawsuit

against Tri-State Generation and Transmission Association (Tri-State) in an attempt to reduce energy costs.

Skinner and Tlustos were present at a meeting at which Van Buskirk talked about his campaign and his position on wind energy. Tlustos recorded Van Buskirk's radio program. Skinner listened to Van Buskirk's radio program and read the newspaper article outlining Van Buskirk's campaign platform.

In October 2010, Tlustos purchased and Skinner approved three 30-second radio advertisements. The first advertisement, titled "Wind Energy," aired 73 times between October 5 and 26. It stated:

> Northwest Rural, a not-for-profit, supports renewable energy. However, we are concerned about how the subsidies are funded. Presently, it is very difficult to make wind energy cost effective even with the subsidies that now exits [sic]. When much of the subsidies come through the rural electric utility, a disproportionate amount of the subsidies will be on the backs of the rural customers where the lowest quantities of the population live. Northwest Rural cares about the consumer.

The second advertisement, titled "Rates," was broadcast 73 times between October 6 and 26, 2010. It stated:

> As you may know, Northwest Rural Public Power District has joined with four other Nebraska power systems to form the Nebraska Power Supply Issues Group (NPSIG). As part of this effort, Northwest Rural has been engaged in numerous discussions with Tri-State . . . regarding a dispute over the rates that Tri-State charges to its Nebraska-based members. On behalf of our customers, Northwest Rural continues to work toward finding a fair and equitable solution to this problem. Northwest Rural "cares about the consumer."

The third advertisement, titled "Generation Duplication," aired 98 times between October 27 and November 23, 2010. It stated:

> Due to the fact that most renewable generating resources are intermittent, the generation equipment becomes a duplication of existing electric generation costs. Thus increasing the cost of providing electricity to all since

full capacity of existing resources must be in place and available at all times. Also, renewable generation is most often not on at our peak requirement time and reduces the efficiency of lightly loaded non-intermittent generation resources. Presently, it is very difficult to make wind energy cost effective. Northwest Rural Public Power District cares about the consumer.

Hereinafter, we refer to these three advertisements collectively as "the radio advertisements."

Sometime between October 11 and 28, 2010, Van Buskirk sent out a campaign letter regarding the radio advertisements. He stated:

"I find it interesting that [NRPPD] has been running radio advertisements which discredit wind power as a possibility for the district because of subsidies and the subsequent burden will fall on rural residents[.]" . . .

. . . .

[NRPPD's] power supplier is Tri-State . . . so by definition we . . . are subsidizing Tri-State . . . and the State of Colorado's Wind Power Development at the expense of doing nothing at home in Sheridan County. . . .

Wind Power is being subsidized everywhere around us. So, let's start subsidizing our own wind development rather than Colorado's. . . .

. . . .

"Misleading [NRPPD] radio advertisements regarding local subsidies for wind energy is [sic] a poor use of [NRPPD] resources . . . . This stinks."

Van Buskirk requested that Tlustos stop airing the radio advertisements. He did not do so.

On October 21, 2010, Van Buskirk filed complaints with the Commission against Skinner and Tlustos for airing the radio advertisements. Van Buskirk objected to the radio advertisements because they "directly contradict[ed]" his pro-wind-energy platform. Skinner and Tlustos denied the allegations. After conducting a preliminary investigation, the Commission determined that there was probable cause for the complaints.

On November 7, 2011, the parties appeared before a hearing officer and adduced evidence. They agreed that NRPPD

was a governmental entity and that Skinner and Tlustos were public employees subject to the Act. The disputed question was whether the radio advertisements were "campaigning" for purposes of § 49-14,101.02(2).

Van Buskirk conceded that the radio advertisements did not specifically mention his campaign, his pro-wind-energy platform, his name, or the November 2010 election. But he claimed the radio advertisements were directed at his campaign, because they were "directly attacking issues that [he] was the only one in the county raising," such as wind energy, economic development through wind energy, and cost containment.

Skinner testified that he knew Van Buskirk was "promoting wind" during the campaign and that wind energy and rate containment were the issues on which Van Buskirk was running in the election. But Skinner and Tlustos testified that the radio advertisements were intended for a purpose other than to respond to Van Buskirk's campaign. Tlustos testified that he created the radio advertisements because the Board instructed him to "do a better job of informing [NRPPD's] consumers" on wind energy. Tlustos explained, as did Skinner, that the radio advertisements were meant to correct "inaccuracies" and "misconceptions" in the information that the public had received about wind energy, generation duplication, and rates. Skinner testified that Van Buskirk was responsible for disseminating "[p]art" of the information the radio advertisements were intended to correct. But Skinner did not state whether anyone other than Van Buskirk was providing the public with "misconceptions" about wind energy.

The hearing officer presented recommended findings of fact and conclusions of law to the Commission. He determined that the radio advertisements were "politically motivated and for the purpose of campaigning against Van Buskirk's election as a candidate for the [B]oard." He based this conclusion on the following facts: (1) The radio advertisements were discontinued shortly after the November 2010 election; (2) the radio advertisements were more specific and more expensive than previous "infomercials"; (3) during the month prior to the election, the radio advertisements were aired

a large number of times; (4) Skinner and Tlustos refused Van Buskirk's request to stop airing the radio advertisements; (5) the radio advertisements were close in proximity to the election; (6) the radio advertisements contradicted Van Buskirk's campaign platform; and (7) Van Buskirk was the only candidate raising the issues addressed by the radio advertisements. The hearing officer ultimately concluded that Skinner and Tlustos expended public funds "for the purpose of campaigning," in violation of § 49-14,101.02(2).

The full Commission adopted the hearing officer's recommended findings of fact and conclusions of law. It ordered Skinner and Tlustos to each pay a civil penalty of $2,000.

Skinner and Tlustos appealed to the district court, assigning error to the Commission's interpretation and application of § 49-14,101.02(2). They argued that the Commission's order was (1) "[a]n unconstitutional application" of § 49-14,101.02(2), (2) "an erroneous determination of what action may be regulated as 'campaigning'" under the statute, (3) "inconsistent" with the strict interpretation of penal statutes, and (4) "contrary to the evidence." NRPPD and the president of the Board requested leave to intervene, which the court granted.

After a consolidated hearing, the district court reversed and set aside the Commission's order and vacated the imposition of fines. The court adopted the following definition of "campaigning" from a Webster's dictionary: "'to lead or take part in a campaign to support or oppose someone or something or to achieve something.'" Using this definition, the court found that the radio advertisements were "informational only." It emphasized that the radio advertisements did not identify Van Buskirk "by name, office, or unambiguous reference" and that NRPPD had an "extensive history of communicating to its rate payers . . . on the issues of wind power, rate containment and economic development." The court concluded that the radio advertisements were "genuine issue advertisements that focus on a particular issue" and that the use of NRPPD funds to purchase such advertisements did not constitute "campaigning" within the definition of § 49-14,101.02(2).

The Commission timely appeals. Pursuant to our statutory authority to regulate the dockets of the appellate courts of this state, we moved the case to our docket. See Neb. Rev. Stat. § 24-1106(3) (Reissue 2008).

## IV. ASSIGNMENTS OF ERROR

The Commission assigns, restated and consolidated, that the district court erred in (1) determining that Skinner's and Tlustos' use of public resources did not violate § 49-14,101.02(2) and, consequently, reversing and setting aside the decision of the Commission; (2) concluding that Skinner and Tlustos, as public employees spending public funds, had First Amendment rights to expend those funds; and (3) its interpretation of § 49-14,101.02(2) that only explicit references to a candidate were impermissible under the statute.

## V. ANALYSIS

### 1. § 49-14,101.02(2)

The issue is whether, by purchasing the radio advertisements, Skinner and Tlustos used public resources "for the purpose of campaigning." Section 49-14,101.02(2) states:

> Except as otherwise provided in this section, a public official or public employee shall not use or authorize the use of public resources for the purpose of campaigning for or against the nomination or election of a candidate or the qualification, passage, or defeat of a ballot question.

None of the exceptions in § 49-14,101.02 apply in this case.

### (a) Public Resources

We first dispose of Skinner's and Tlustos' argument that they did not use public resources to purchase the radio advertisements. "[U]se of public resources" is a basic element of § 49-14,101.02(2). "[P]ublic resources" are defined as "personnel, property, resources, or funds under the official care and control of a public official or public employee." § 49-14,101.02(1).

Given their roles at NRPPD, Skinner and Tlustos were in charge of the funds available for radio advertisements. As general manager, Skinner was responsible for the "day-to-day affairs" of NRPPD and was authorized by the Board to "operate all of the operations of [NRPPD]." Tlustos was "in charge of advertising" and handled the placement of advertisements on the radio, a matter over which the Board gave him "a lot of discretion." Tlustos testified that cost was a major consideration in the placement of advertisements and that he tried to "watch [his] pennies, dollars spent, budget items."

The NRPPD funds used to purchase the radio advertisements were in the "care and control" of public employees and, thus, were "public resources" for purposes of the Act. See § 49-14,101.02(1). Skinner and Tlustos used public resources when they used NRPPD funds to purchase the radio advertisements.

### (b) "For the Purpose of Campaigning"

#### *(i) Statutory Meaning*

[5-7] The next question is whether the radio advertisements were purchased "for the purpose of campaigning," as prohibited by § 49-14,101.02(2). To determine the meaning of the phrase "for the purpose of campaigning," we use well-established principles of statutory interpretation. Section 49-14,101.02 is penal in nature and must be strictly construed. See *Vokal v. Nebraska Acct. & Disclosure Comm.*, 276 Neb. 988, 759 N.W.2d 75 (2009). Penal statutes are considered in the context of the object sought to be accomplished, the evils and mischiefs sought to be remedied, and the purpose sought to be served. *Id*. Effect must be given, if possible, to all parts of a penal statute; no sentence, clause, or word should be rejected as meaningless or superfluous if it can be avoided. *State v. Garza*, 256 Neb. 752, 592 N.W.2d 485 (1999). "'The rule requiring strict construction of penal statutes is not violated by giving words of the statute their full meaning in the connection in which they are employed.'" *State ex rel. Grams v. Beach*, 243 Neb. 126, 129, 498 N.W.2d 83, 85-86 (1993), quoting *State v. Ewing*, 221 Neb. 462, 378 N.W.2d 158 (1985).

[8-10] As with any statute, "we must determine and give effect to the purpose and intent of the Legislature as ascertained from the entire language of the statute considered in its plain, ordinary, and popular sense, it being our duty to discover, if possible, the Legislature's intent from the language of the statute itself." *Vokal*, 276 Neb. at 992, 759 N.W.2d at 79. "[T]he intent of the Legislature may be derived from both the words that it used in a statute and those that it did not." *Gibbs Cattle Co. v. Bixler*, 285 Neb. 952, 960, 831 N.W.2d 696, 702 (2013). In the absence of a statutory indication to the contrary, this court gives words in a statute their ordinary meaning. *Vlach v. Vlach*, 286 Neb. 141, 835 N.W.2d 72 (2013).

In previous cases interpreting the Act, we have relied on the dictionary to define terms not explicitly defined in the Act. See *Vokal, supra*. Because neither the phrase "for the purpose of campaigning" nor its component words are specifically defined in the Act, we employ dictionary definitions to interpret § 49-14,101.02(2), as did the district court.

"Campaign" is defined as "a series of operations or efforts designed to influence the public to support a particular political candidate, ticket, or measure." Webster's Third New International Dictionary of the English Language, Unabridged 322 (1993). Although this definition does not recognize that a campaign can be positively or negatively oriented toward a candidate or issue, § 49-14,101.02(2) does so by using the language "for or against." As a verb, "campaign" means "to go on, engage in, or conduct a campaign." Webster's, *supra* at 322. Accordingly, "campaigning" is the act of engaging in a series of operations or efforts designed to influence public support for or against a particular political candidate, ticket, or measure.

"[F]or the purpose of campaigning" emphasizes the intent with which public resources are used. "Purpose" is "something that one sets before himself as an object to be attained" or "an object, effect, or result aimed at, intended, or attained." *Id*. at 1847. Thus, public resources are used "for the purpose of campaigning" when their use is intended to influence public support for or against a particular political candidate, ticket, or measure.

So construed, § 49-14,101.02(2) prohibits the expenditure of public resources for activities intended to have the effect of influencing public support for or against a particular political candidate, ticket, or measure. This interpretation gives effect to the Legislature's intent to prohibit the use of public resources "for the purpose of campaigning," see § 49-14,101.02(2), and is consistent with the Legislature's stated intent of making state and local elections "free of corruption *and the appearance of corruption*," see § 49-1402(2) (emphasis supplied).

We note, as we did earlier, that the use of public resources is necessary for there to be a violation of § 49-14,101.02(2). Consequently, where public resources are not used, this statute does not prohibit public officials and public employees from engaging in activities that are intended to have the effect of influencing public support for or against a particular political candidate, ticket, or measure. It is the "use of public resources for the purpose of campaigning," not the campaigning by public officials or public employees, that is prohibited by § 49-14,101.02(2).

The district court limited the scope of § 49-14,101.02(2) to only those activities that expressly identify a candidate, election, or political party. To determine whether the radio advertisements were campaigning, the court looked for the characteristics of "express advocacy" identified in federal case law. See *Federal Election Comm'n v. Wisconsin Right to Life, Inc.*, 551 U.S. 449, 470, 127 S. Ct. 2652, 168 L. Ed. 2d 329 (2007) (advertisements lacked "indicia of express advocacy" because they did not "mention an election, candidacy, political party, or challenger" or "take a position on a candidate's character, qualifications, or fitness for office").

Similarly, Skinner and Tlustos argue that § 49-14,101.02(2) must be interpreted in a manner consistent with federal law governing the financing of federal election campaigns. They claim that § 49-14,101.02(2) makes a distinction between express advocacy and "issue advocacy." These concepts have been extensively discussed by federal courts addressing First Amendment issues related to campaign finance. See, e.g., *Federal Election Comm'n, supra*. Skinner and Tlustos suggest that we adopt the definitions of

"electioneering communication" and "expressly advocating" provided in federal campaign finance law and apply them to § 49-14,101.02(2).

But the plain language of § 49-14,101.02(2) does not support the application or use of either of those proposed definitions. The concepts of an electioneering communication and express advocacy were specifically developed and defined for the purpose of federal campaign finance regulation. Such definitions are inapposite to the language of the Act, which does not address federal campaign finance regulation or the expenditure of private funds. Section 49-14,101.02(2) refers explicitly to the term "campaigning" and does not use the terms "electioneering communication," "express advocacy," or "expressly advocating." We cannot add such language to the statute, nor can we ignore the distinction between the terms "electioneering communication," "express advocacy," and "expressly advocating" in federal law and "campaigning" in the state statute. The legislative intent is derived from the fact that the Legislature used only the term "campaigning." See *Gibbs Cattle Co. v. Bixler*, 285 Neb. 952, 831 N.W.2d 696 (2013).

The definitions of "electioneering communication" and "expressly advocating" are specific to communications that refer to a "clearly identified" candidate. See, 2 U.S.C. § 434(f)(3)(A) (2012); 11 C.F.R. § 100.22 (2014). Indeed, federal case law distinguishes express advocacy from issue advocacy, because express advocacy explicitly refers to a candidate, whereas a "genuine issue ad" does not. See *Federal Election Comm'n*, 551 U.S. at 470. But § 49-14,101.02(2) does not use the terms "express advocacy," "expressly advocating," "genuine issue ad," or "issue advocacy" and is not limited to campaigning only for or against a candidate. Section 49-14,101.02(2) also prohibits "campaigning for or against . . . the qualification, passage, or defeat of a ballot question," which relates to noncandidate elections. As a consequence, the fact that an activity refers to an issue and thus does not fit within the definitions of "electioneering communication" and "expressly advocating" does not mean that the activity is permitted by the statute. The language of § 49-14,101.02(2)

does not make a distinction between express advocacy and issue advocacy.

The Supreme Court of California rejected the express advocacy standard as a means of determining when public funds have been expended for improper campaign activities. See *Vargas v. City of Salinas*, 46 Cal. 4th 1, 205 P.3d 207, 92 Cal. Rptr. 3d 286 (2009). We find its reasoning instructive.

In California, public funds may not be used for "campaign" purposes but can be used for "informational" purposes. See *Stanson v. Mott*, 17 Cal. 3d 206, 221, 551 P.2d 1, 11, 130 Cal. Rptr. 697, 707 (1976). Certain activities "unquestionably [constitute] improper campaign activity." *Id*. When it is unclear whether a particular expenditure is a campaign activity or simply informational, the court engages in a "careful consideration of such factors as the style, tenor and timing of the publication; no hard and fast rule governs every case." *Id*. at 222, 551 P.2d at 12, 130 Cal. Rptr. at 708.

In *Vargas, supra*, the Supreme Court of California declined to replace the aforementioned approach from *Stanson, supra*, with one that relied on the concept of express advocacy:

> Whatever virtue the "express advocacy" standard might have in the context of the regulation of campaign contributions to and expenditures by candidates for public office, this standard does not meaningfully address the potential constitutional problems arising from the use of *public funds* for *campaign activities* . . . . If a public entity could expend public funds for *any* type of election-related communication so long as the communication avoided "express words of advocacy" and did not "unambiguously urge[ ] a particular result" . . . , the public entity easily could overwhelm the voters by using the public treasury to finance bumper stickers, posters, television and radio advertisements, and other campaign material containing messages that, while eschewing the use of express advocacy, nonetheless as a realistic manner effectively promote one side of an election. . . .
>
> Thus, when viewed from a realistic perspective, the "express advocacy" standard does not provide a suitable means for distinguishing the type of *campaign* activities

that . . . presumptively may not be paid for with public funds, from the type of *informational* material that presumptively may be compiled and made available to the public through the expenditure of such funds.

*Vargas*, 46 Cal. 4th at 31-33, 205 P.3d at 226-27, 92 Cal. Rptr. 3d at 309-10 (emphasis and alteration in original).

We agree with the Supreme Court of California that the express advocacy standard does not provide a suitable means for identifying the type of campaign activities that may not be paid for with public funds. See *Vargas, supra*. Whether the use of public resources for a particular activity constitutes a violation of § 49-14,101.02(2) does not hinge upon the existence or absence of express advocacy. Rather, the relevant question is whether public resources were used with the intent to influence public support for or against a particular candidate, ticket, or measure.

### (ii) Application to Radio
### Advertisements

To ascertain whether the radio advertisements were "for the purpose of campaigning," the district court considered only whether they possessed the characteristics of express advocacy or issue advocacy. It found that the radio advertisements were "genuine issue advertisements," because they "focus[ed] on a particular issue, [took] a position on that issue, urge[d] the public to adopt that position, and urge[d] the public to contact public officials if they [had] any question with respect to the matter." The court concluded that the radio advertisements lacked "any indicia of campaigning," because they did not "mention the general election of November 2, 2010, the candidacy of Van Buskirk or any of his challengers, or any political party" and did not "take a position on the character, qualifications, or fitness for office of Van Buskirk." Based on these findings of fact, the court concluded that the radio advertisements were not a violation of § 49-14,101.02(2).

The district court's analysis reveals that it used express advocacy as the standard by which to determine whether the radio advertisements were "campaigning" under § 49-14,101.02(2). It equated campaigning with express advocacy and thus

considered the characteristics of express advocacy identified in federal case law to be the sole "indicia of campaigning." See *Federal Election Comm'n v. Wisconsin Right to Life, Inc.*, 551 U.S. 449, 127 S. Ct. 2652, 168 L. Ed. 2d 329 (2007). Because the court found the radio advertisements were not express advocacy but issue advocacy, it concluded they did not violate the prohibition against using public resources for campaigning.

But express advocacy is not the standard to be applied to § 49-14,101.02(2). As we have explained, § 49-14,101.02(2) does not make a distinction between express advocacy and issue advocacy. It prohibits the "use of public resources for the purpose of campaigning for or against" candidates or issues in an upcoming election. See *id*. It does not distinguish between activities based on the characteristics of express advocacy or issue advocacy.

A violation of § 49-14,101.02(2) does not depend upon the identification of a candidate, an election date, or a political party or a discussion of a candidate's qualifications and fitness for office. Indeed, the statute may be violated when such characteristics are absent. Rather, a violation occurs when public resources are used with the intent to influence public support for or against a candidate or ballot issue. Given this fact, in order to determine whether there has been a violation of § 49-14,101.02(2), a court must consider the intent behind the expenditure of public resources.

The district court concluded, without considering this factor, that Skinner's and Tlustos' purchase of the radio advertisements did not violate § 49-14,101.02(2). It erroneously viewed the radio advertisements under the lens of express advocacy and made findings of fact based only on whether the radio advertisements mentioned the general election, the candidacy of Van Buskirk, his qualifications and fitness for office, or a political party. The court failed to consider whether the radio advertisements were purchased with the intent to influence public support for or against Van Buskirk. Without consideration of intent, the court's conclusion that Skinner and Tlustos did not violate § 49-14,101.02(2) did not conform to the law and must be reversed.

[11,12] Before it can be ascertained whether Skinner and Tlustos violated § 49-14,101.02(2), a factual determination must be made whether the radio advertisements were purchased with the intent to influence public support for or against Van Buskirk. As explained above, the district court did not make a factual determination as to Skinner's and Tlustos' intent. An appellate court reviewing for errors appearing on the record does not make factual determinations that should be made by the finder of fact. See *Blaser v. County of Madison*, 285 Neb. 290, 826 N.W.2d 554 (2013). Intent is a question for the trier of fact. See, *McKinney v. Okoye*, 287 Neb. 261, 842 N.W.2d 581 (2014); *Podraza v. New Century Physicians of Neb.*, 280 Neb. 678, 789 N.W.2d 260 (2010); *Lone Cedar Ranches v. Jandebeur*, 246 Neb. 769, 523 N.W.2d 364 (1994). Although a district court in its de novo review of agency determinations is not required to give deference to the findings of fact by the agency hearing officer, it may consider the fact that the hearing officer, sitting as the trier of fact, saw and heard the witnesses and observed their demeanor while testifying and may give weight to the hearing officer's judgment as to credibility. *Stejskal v. Department of Admin. Servs.*, 266 Neb. 346, 665 N.W.2d 576 (2003).

Therefore, we remand the cause for further proceedings to consider whether the radio advertisements were purchased "for the purpose of campaigning"—that is, with the intent to influence public support against Van Buskirk. On remand, consideration of only the content of the radio advertisements is not sufficient to determine Skinner's and Tlustos' intent. In addition to the content of the advertisements, the court should consider all other relevant factors, including, but not limited to the following: the platform of or issues raised by Van Buskirk, whether Van Buskirk was the only candidate campaigning on those issues, whether the radio advertisements took a position for or against the issues central to Van Buskirk's campaign, the timing and frequency of the radio advertisements, and how the radio advertisements compared to prior public service announcements or advertisements. The court is not limited to these considerations, but clearly, the court cannot base its determination solely upon

the characteristics of express advocacy. Both the content of the communication and all of the surrounding circumstances should be considered. The weight to be given to each piece of evidence depends upon the specific facts in a given situation and is a matter for the trier of fact. Ultimately, the court must determine whether the radio advertisements were purchased "for the purpose of campaigning," in violation of § 49-14,101.02(2).

## 2. Freedom of Speech

The Commission assigns that the district court erred in concluding that Skinner's and Tlustos' actions were protected by the First Amendment. While the court mentioned the First Amendment, we do not ascertain that it relied on the First Amendment in reaching its decision.

[13] However, because the issue is likely to recur on remand, we briefly explain why the district court should not consider the First Amendment rights of Skinner and Tlustos or NRPPD. An appellate court may, at its discretion, discuss issues unnecessary to the disposition of an appeal where those issues are likely to recur during further proceedings. *State v. Edwards*, 286 Neb. 404, 837 N.W.2d 81 (2013).

The First Amendment was implicated in this case only to the extent that Skinner and Tlustos raised an "as applied" challenge to the constitutionality of § 49-14,101.02(2) in their appeal from the Commission's decision. They claim to have raised such a challenge. But in purportedly doing so, they did not argue that § 49-14,101.02(2) limited their individual political speech in an unconstitutional manner. Rather, they "have steadfastly contended throughout this proceeding that the speech at issue is by [NRPPD]." Brief for appellees Skinner and Tlustos at 15. Thus, Skinner's and Tlustos' initial appeal to the district court did not present a challenge to the constitutionality of § 49-14,101.02(2) as applied to their speech. As their appeal was framed, the court was presented with a challenge to the constitutionality of the statute as applied only to the speech of NRPPD.

[14] Skinner and Tlustos did not have standing to challenge the constitutionality of § 49-14,101.02(2) as applied to

NRPPD, and as a result, the district court lacked jurisdiction to address such a challenge.

> It is firmly established as the universal rule that a person "may attack the constitutionality of a statute only when and so far as it is being or is about to be applied to his disadvantage; and to raise the question he must show that the alleged unconstitutional feature of the statute injures him and so operates as to deprive him of a constitutional right, and, of course, it is prerequisite that he establish in himself the claimed right which is alleged to be infringed."

*State ex rel. Nelson v. Butler*, 145 Neb. 638, 651, 17 N.W.2d 683, 691-92 (1945), quoting 16 C.J.S. *Constitutional Law* § 76 (1939). Skinner and Tlustos did not meet those requirements for bringing an "as applied" challenge to § 49-14,101.02(2) on behalf of NRPPD. Indeed, they remain quite adamant that "the ads in question constitute protected corporate political speech." Brief for appellees Skinner and Tlustos at 14. Skinner and Tlustos sought to vindicate the rights of NRPPD, which they did not have the standing to do.

When NRPPD intervened in these proceedings, it did not allege that § 49-14,101.02(2) had been applied by the Commission in a manner that unconstitutionally limited NRPPD's speech. On appeal, NRPPD does not allege any such violation, and at oral argument, NRPPD argued that the First Amendment was not relevant to this appeal. At each of these stages in the proceeding, NRPPD did not assert a constitutional challenge to § 49-14,101.02(2).

Skinner and Tlustos did not assert that their personal rights were implicated, and they did not have standing to assert the rights of NRPPD. Therefore, the district court did not have jurisdiction to consider the constitutionality of the statute as applied in the instant case.

## VI. CONCLUSION

The district court's conclusion that Skinner and Tlustos had not violated § 49-14,101.02(2) was based on an interpretation of the statute that was contrary to the law. The constitutionality of § 49-14,101.02(2) is not before the court

and should not be considered on remand. For the reasons stated herein, we reverse the judgment of the district court and remand the cause for further proceedings consistent with this opinion.

Reversed and remanded for further proceedings.

---

State of Nebraska, appellee, v.
Shad M. Knutson, appellant.
___ N.W.2d ___

Filed August 15, 2014.    No. S-13-558.

1. **Criminal Law: Trial.** A motion for separate trial is addressed to the sound discretion of the trial court, and its ruling on such motion will not be disturbed in the absence of a showing of an abuse of discretion.
2. **Constitutional Law: Trial: Joinder.** A defendant has no constitutional right to a separate trial on different charges. Neb. Rev. Stat. § 29-2002 (Reissue 2008) controls the joinder or separation of charges for trial.
3. **Trial: Joinder: Appeal and Error.** Under Neb. Rev. Stat. § 29-2002 (Reissue 2008), whether offenses were properly joined involves a two-stage analysis in which an appellate court first determines whether the offenses were related and joinable and then determines whether an otherwise proper joinder was prejudicial to the defendant.
4. ____: ____: ____. To determine whether the charges joined for trial are of the same or similar character, an appellate court looks at the underlying factual allegations.
5. **Trial: Joinder: Proof.** A defendant opposing joinder of charges has the burden of proving prejudice.
6. **Trial: Joinder: Evidence: Jury Instructions.** No prejudice from joined charges usually occurs if the evidence is sufficiently simple and distinct for the jury to easily separate evidence of the charges during deliberations. This is particularly true when the trial court specifically instructed the jury to separately consider the evidence for each offense.
7. **Constitutional Law: Search and Seizure: Motions to Suppress: Appeal and Error.** In reviewing a trial court's ruling on a motion to suppress evidence based on a claimed violation of the Fourth Amendment, an appellate court applies a two-part standard of review. Regarding historical facts, an appellate court reviews the trial court's findings for clear error. But whether those facts trigger or violate Fourth Amendment protections is a question of law that an appellate court reviews independently of the trial court's determination.
8. **Constitutional Law: Search and Seizure.** The Fourth Amendment to the U.S. Constitution and article I, § 7, of the Nebraska Constitution protect individuals against unreasonable searches and seizures by the government.