Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
01/03/2025 09:08 AM CST

State of Nebraska, appellee, v.
Benjamin D. Rieker, appellant.

___ N.W.3d ___

Filed January 3, 2025.    No. S-23-818.

1. **Motions to Suppress: Confessions: Constitutional Law: Appeal and Error.** In reviewing a motion to suppress based on the claimed involuntariness of a statement, an appellate court applies a two-part standard of review. With regard to historical facts, an appellate court reviews the trial court's findings for clear error. Whether those facts suffice to meet the constitutional standards, however, is a question of law, which an appellate court reviews independently of the trial court's determination.

2. **Criminal Law: Courts: Appeal and Error.** In an appeal of a criminal case from the county court, the district court sits as an intermediate court of appeals.

3. **Courts: Appeal and Error.** Both the district court and a higher appellate court generally review appeals from the county court for error appearing on the record.

4. **Judgments: Appeal and Error.** When reviewing a judgment for errors appearing on the record, an appellate court's inquiry is whether the decision conforms to the law, is supported by competent evidence, and is neither arbitrary, capricious, nor unreasonable.

5. **Evidence: Appeal and Error.** In considering a claim of insufficient evidence, an appellate court will not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence. Such matters are for the finder of fact.

6. **Convictions: Evidence: Appeal and Error.** Absent prejudicial error, a conviction will generally be affirmed so long as the evidence admitted at trial, viewed and construed most favorably to the State, is sufficient to support the elements of conviction beyond a reasonable doubt.

7. **Self-Defense.** To justify the use of force under Neb. Rev. Stat. § 28-1411 (Reissue 2016), a defendant must have a reasonable and good faith belief in the necessity of using force and the force used in defense must

be immediately necessary and justified under the circumstances. It is not enough that the defendant subjectively believed in the need to use force; the defendant must produce evidence that this subjective belief was also objectively reasonable.

8. **Criminal Law: Trial: Evidence: Proof.** In the absence of a statute placing the burden of proving an affirmative defense on the defendant in a criminal case, the nature of an affirmative defense is such that the defendant has the initial burden of going forward with evidence of the defense, and once the defendant has produced sufficient evidence to raise the defense, the issue becomes one which the State must disprove.

9. **Trial: Evidence: Proof.** The evidence necessary to raise an affirmative defense may be adduced either by the defendant's witnesses or in the State's case in chief without the necessity of the defendant's presenting evidence.

10. ____: ____: ____. A defendant need only adduce a slight amount of evidence to satisfy the initial burden of raising an affirmative defense. Once an affirmative defense has been successfully raised, disproving that affirmative defense becomes the last element the State is required to prove beyond a reasonable doubt.

11. **Criminal Law: Trial: Judges: Presumptions.** A trial judge sitting without a jury is not required to articulate findings of fact or conclusions of law in criminal cases. Instead, it is presumed in a criminal bench trial that the judge is familiar with and applied the proper rules of law, unless it clearly appears otherwise.

12. **Trial: Convictions: Evidence: Appeal and Error.** An appellate court will sustain a conviction in a bench trial of a criminal case if the properly admitted evidence, viewed and construed most favorably to the State, is sufficient to support that conviction.

13. **Self-Defense.** Under Neb. Rev. Stat. § 28-1411 (Reissue 2016), a defendant is justified in using force to protect property if the defendant (1) reasonably believed the property was in the defendant's possession or in the possession of another for whose protection the defendant was acting; (2) reasonably believed that the force used against the victim was immediately necessary to prevent or terminate an unlawful entry or trespass on the property; (3) first asked the victim to desist from interfering with the property, unless the defendant had a reasonable belief that asking first would be useless, dangerous, or result in substantial property damage; and (4) did not know that using force to exclude the victim would expose the victim to a substantial danger of bodily harm.

14. **Criminal Law: False Reporting: Intent: Proof.** Under Neb. Rev. Stat. § 28-907(1)(a) (Reissue 2016), the elements the State must prove beyond a reasonable doubt to convict a defendant of false reporting are:

(1) The defendant furnished material information to a peace officer or other official, (2) the defendant did so knowing the information to be false, and (3) the defendant did so with the intent to either (a) instigate the investigation of an alleged criminal matter or (b) impede the investigation of an actual criminal matter.

15. **Criminal Law: Police Officers and Sheriffs: False Reporting.** The purpose of Neb. Rev. Stat. § 28-907(1)(a) (Reissue 2016) is to prevent the public from willfully furnishing erroneous information to law enforcement officers and thus interfering with the performance of their duties.

16. **Evidence: Words and Phrases.** Generally, the materiality of evidence depends upon the relationship between the proposition for which it is being considered and the issues presented; evidence related to a matter not in issue is immaterial.

17. **Criminal Law: Evidence.** For purposes of Neb. Rev. Stat. § 28-907(1)(a) (Reissue 2016), information is material if it has a natural tendency to influence, or is capable of influencing, any proper matter of inquiry in a criminal investigation.

18. **Testimony: Oaths and Affirmations: Proof.** It is up to the jury to decide whether the defendant believed in the truth of his or her testimony when uttered. The knowledge of falsity may be inferred by the trier of fact from the surrounding circumstances, and such an inference may be derived from several sources: the objective falsity itself, a motive to lie, or facts tending to show generally that defendant knew his or her affirmation was false. Objective falsity as proof of knowledge arises when actual falsity is established and defendant's awareness of it is inescapable and self-evident. Proof of the falsity of a response may circumstantially imply knowledge that such was untrue when uttered.

19. **Criminal Law: Police Officers and Sheriffs: False Reporting: Words and Phrases.** The phrase "the investigation of an actual criminal matter" as used in Neb. Rev. Stat. § 28-907(1)(a) (Reissue 2016) requires that there be a legitimate and valid investigation of facts that could constitute a predicate criminal offense.

20. ____: ____: ____: ____. The word "actual" in Neb. Rev. Stat. § 28-907(1)(a) (Reissue 2016) adds an element of objectivity to ensure that before a person is questioned concerning a criminal matter, the police must be able to point to particular facts and circumstances which would lead a reasonable person to believe that criminal activity was afoot.

21. **Criminal Law: Evidence: False Reporting: Intent.** The requisite intent to impede an investigation under Neb. Rev. Stat. § 28-907(1)(a) (Reissue 2016) can be proved through circumstantial evidence, and the

intent with which an act is done is inferable from the act itself and from the facts and circumstances surrounding it. But as long as an actual criminal matter is at issue, one need not actually impede the criminal investigation into that matter to be guilty of false reporting.

22. **Trial: Convictions: Evidence.** In a criminal case, the improper admission of evidence is harmless beyond a reasonable doubt when the evidence is cumulative and there is other competent evidence to support the conviction.

23. **Trial: Evidence: Proof: Appeal and Error.** In a bench trial of a criminal action, if the properly admitted evidence supports the conviction, an appellate court will affirm unless the appellant shows the trial court actually resolved a factual issue based upon improperly admitted evidence.

Appeal from the District Court for Lancaster County, Kevin R. McManaman, Judge, on appeal thereto from the County Court for Lancaster County, Matthew L. Acton, Judge. Judgment of District Court affirmed.

Carlos A. Monzon, of Monzon, Guerra & Chipman, and Gerald L. Soucie for appellant.

Michael T. Hilgers, Attorney General, and Melissa R. Vincent for appellee.

Miller-Lerman, Cassel, Stacy, Funke, Papik, and Freudenberg, JJ.

Stacy, J.

After a bench trial in the county court, Benjamin D. Rieker was convicted of one count of third degree assault and one count of false reporting, both Class I misdemeanors. He was sentenced to 18 months' probation on each conviction, with the sentences to be served concurrently. On direct appeal to the district court, both convictions were affirmed. Rieker appeals again, assigning error to an evidentiary ruling and challenging the sufficiency of the evidence to support his convictions. We affirm.

## I. BACKGROUND

In 2020, Rieker was an officer with the Lincoln Police Department (LPD). He also worked off duty for a private firm that provided security for a hospital in Lincoln, Nebraska. It is undisputed that while working for the private security firm, Rieker wore his LPD uniform, carried his LPD-issued gun, and was required to follow all LPD policies.

### 1. Events of October 31, 2020

On October 31, 2020, at approximately 8 p.m., Rieker was working a private security shift at the hospital when Jan Noch arrived in the emergency department via ambulance. Noch had an infection in his foot and went to the hospital seeking pain medication. This was the second time that day Noch had been transported by ambulance to the hospital.

During Noch's earlier visit to the hospital on October 31, 2020, he became upset when he did not receive the pain medication he wanted. Hospital staff arranged for a taxi to pick up Noch, and while he was waiting in the main lobby of the emergency room (main lobby) for the taxi to arrive, there was evidence that Noch was disruptive.

When Noch arrived at the hospital later that day, ambulance personnel alerted hospital staff that extra security might be needed because Noch was angry and yelling. While being taken to a treatment room, Noch yelled and cursed at hospital security personnel and stated that he "hate[d] cops." When Rieker went into Noch's treatment room to calm him down, Noch cursed and yelled at him. Rieker left the room to deescalate the situation and stood outside the room for a time before being called to another area of the hospital for a different security matter.

Approximately 20 minutes later, Noch decided to leave the hospital against medical advice and after being told, again, that he would not receive the pain medication he wanted. Hospital staff contacted Rieker and reported that Noch had threatened nursing staff and was heading toward the main lobby area.

Rieker encountered Noch in a hallway located near the main lobby. Noch was walking toward the main lobby exit in his stocking feet; he did not have on a coat or shoes. There were two exits nearby—one in the main lobby leading outside to the area where Noch had gotten into the taxi earlier in the day and another leading outside through the ambulance bay.

Two hospital security cameras captured video of the encounter between Noch and Rieker in the hallway, but neither camera recorded audio. During a 3-day bench trial, the security video was received into evidence. In addition, various eyewitnesses testified about the encounter between Noch and Rieker in the hallway. As relevant to the issues on appeal, we summarize their testimony.

(a) Rieker's Testimony

Rieker testified that he was familiar with Noch before the events of October 31, 2020, and had heard from other LPD officers that Noch could be violent and might "fight officers for their guns." In addition, Rieker had prior encounters with Noch, during which Noch was "abusive" and "belligerent." During Rieker's hospital shift on October 31, he was aware that Noch had been to the emergency room earlier that day, had threatened and argued with hospital staff, and had been disruptive in the main lobby while waiting for a taxi.

Rieker admitted that Noch was leaving the hospital voluntarily when Rieker stopped him in the hallway. Rieker described that he and Noch were standing approximately 1 to 2 feet apart, facing one another. The main lobby exit was approximately 5 feet behind where Rieker was standing, and the ambulance bay exit was generally behind where Noch was standing. Rieker asked Noch to leave through the ambulance bay doors, rather than the main lobby exit, because he did not want Noch to cause a disturbance in the main lobby area. Noch refused, stating, "Make me . . . . I'm going out [the] front door." Rieker instructed Noch to leave through the ambulance bay doors approximately seven times, and Noch refused to use that exit. Throughout the encounter, Rieker observed Noch

shifting his head and stance, and Rieker believed that Noch was staring at Rieker's Taser and gun. Rieker testified that when Noch threatened to "punch [him] in the teeth," Rieker moved forward to "escort[]" Noch out "[with his] elbows . . . bent [at] 45 degrees, and both hands . . . open palmed." As Rieker did so, he saw Noch bring his shoulders back slightly and clench his fists. Rieker thought Noch was going to punch him, so he "pushed" Noch with his left arm while keeping his right arm "bladed" over his gun. Rieker said that after that push, Noch "slipped" backward and fell.

Rieker testified that once Noch was handcuffed and escorted outside, Noch "apologized" to him and "said that he shouldn't have been squaring up on me, shouldn't have been staring at my gun."

### (b) Noch's Testimony

Noch testified that he was angry when he encountered Rieker in the hallway, and he admitted being "pretty rude" and cursing when Rieker instructed him to leave through the ambulance bay exit. Noch said he refused those requests because he wanted to leave through the main lobby exit instead so he could "have them call me a cab" to get home. Noch denied raising his hand or clenching his fists at any point during the encounter with Rieker. But he testified that in an effort to calm himself down, he was counting his fingers by quickly pressing them one by one against his thumb. Noch admitted he was rude to Rieker throughout the encounter, but he denied making any threats to "punch" him. Noch also denied slipping and falling during the encounter, and instead testified that Rieker "decked" him and "knocked me off my feet and bounced my head off the linoleum." Noch testified he saw "stars" and felt like he was "getting hit in the head with a baseball bat." After the fall, Noch was handcuffed and escorted off the premises by Rieker and other officers. Noch testified that once they were outside of the hospital, Rieker attempted to explain the push by "telling me things that I was doing wrong." According to Noch, Rieker said, "Well, you were posturing. I said, No, I wasn't.

Well, you were looking at my gun. No, I wasn't. Well, you were threatening. No, I wasn't. He kept making stuff up every time I said no."

### (c) Security Officer's Testimony

Hospital security officer Austin Gehrig testified that he followed Noch as he left the treatment room and that he was standing about 10 feet behind Noch when Noch encountered Rieker in the hallway. Gehrig heard Noch repeatedly say that he just wanted to leave, and he heard Rieker repeatedly direct Noch to leave through the ambulance bay exit. Gehrig heard Noch insulting Rieker, but he did not hear him threaten to punch or hit Rieker. Gehrig thought Noch was "jittery" during the encounter, but he never saw Noch make a fist or raise his arms in a threatening manner. After Gehrig heard Rieker tell Noch that he was "getting real tired" of him, he saw Rieker perform an "open palm strike" to Noch's chest with both hands. Gehrig thought Noch may have "stepped up on [Rieker] a little bit" just before Rieker struck him, but Gehrig described being "shook" by Rieker's response because he was not expecting the contact and it "was such a hard strike." Gehrig testified that Noch fell straight back after the strike by Rieker.

### (d) LPD Officer's Testimony

Another off-duty LPD officer, Robert Brenner, also witnessed the hallway encounter. He was standing about 10 to 15 feet behind Noch and did not hear Noch "say anything about punching" Rieker. Brenner saw Rieker point toward Brenner and say, "I'm not the only one here." Brenner turned to see who else was present, and just as he turned back around, he saw Rieker use a "two-hand push . . . stepping one step forward and pushing [Noch] with both hands." Brenner described this as "launch[ing]" Noch. Brenner did not see Noch looking at Rieker's gun and described Noch's hands as "balled up" but "down at his side" during the encounter. He said Noch was in a "slumped stance" and was otherwise "just standing there."

### (e) Security Supervisor's Testimony

The supervisor of hospital security also witnessed the encounter between Noch and Rieker. The supervisor was standing about 12 to 14 feet away, near Gehrig and Brenner, and did not hear everything that was said. According to the supervisor, Rieker seemed agitated during the encounter and Noch seemed frustrated. The supervisor thought he heard Rieker say he was "tired" of Noch, and he heard Noch call Rieker a "pig" and say that he did not have to do what Rieker told him to do. The supervisor saw Noch's hands fidgeting as he was standing square to Rieker, and then he heard Rieker say something and observed him push Noch in the chest with both palms. The supervisor testified that he could not "believe what had just happened" and that he did not see any reason for Rieker to "go hands-on."

### (f) Hospital Security Video

Security video of the encounter between Noch and Rieker depicted 8 frames per second, with the feed coming from two separate cameras, and a forensic expert testified that viewing the two feeds together resulted in 16 frames per second. According to the expert, human movement is not typically missed at that speed.

The video does not depict Noch raising his hands, clenching his fists, or moving toward Rieker at any point prior to the physical contact from Rieker. Instead, the video depicts Noch and Rieker facing one another and standing a few feet apart, when Rieker suddenly steps forward and makes contact with Noch by extending both hands directly into Noch's chest, knocking him forcefully to the ground. The video does not show that Rieker's right arm was "bladed" to protect his gun at any point.

## 2. Subsequent Investigations

During the bench trial, the State presented evidence that investigations into the October 31, 2020, incident were conducted by the hospital and by law enforcement. In

connection with those investigations, Rieker prepared written reports describing the incident and was interviewed by law enforcement.

### (a) Written Reports

During Rieker's next LPD shift, he told his supervisor about the off-duty incident with Noch. The supervisor told Rieker that because the incident involved the use of force, LPD policy required him to complete two standard LPD forms: a "Use of Control" form (also referred to as "Use of Force" form) and an "Additional Case Information" form (ACI form). The use of control form is completed by an LPD sergeant who sits with the involved officer and asks questions about the use of force. The ACI form is a narrative report completed by the involved officer that details the use of force.

Rieker started filling out the ACI form on November 1, 2020, and completed it on November 5. In it, Rieker furnished the following information about the events of October 31:

I asked [Noch] if he was leaving. [He] said he was going to walk out the "front fucking door." Due to having dealt with [Noch] previously . . . I did not want [him] to walk through the main ER Lobby and continue to create a disturbance or threaten anyone else. I informed [Noch] he needed to leave out the ambulance bay doors which were directly behind him.

[Noch] squared his shoulders back and began clenching his fists while swearing and making statements similar to "make me motherfucker" and "I'll fucking hit you. I'm going to walk out the front door."

[Noch] made the comment "I'll fight you" as I again told [him] he needed to turn around and leave out the ambulance bay doors. [Noch] began opening and clenching his fists and I observed his breathing to increase as he began staring at my gun. . . .

I began to walk towards [Noch] and was going to escort him out through the ambulance bay doors when he clenched his fists again and started to bring his right

hand upwards in a rapid manner. I perceived [Noch] to be bringing his fist upwards to punch me based off of [Noch's] posture, breathing, and his prior statements. I stepped forward towards [Noch] and used my left arm to "stiff arm" [Noch] away from me with an open palm, while keeping my right arm extended and bladed to keep [Noch] from accessing my gun he was fixated on.

[Noch] was pushed back and took several steps back from my "stiff arm" and slipped on the tile, as he was only wearing socks. [Noch] fell to the ground and he first impacted the ground with his buttocks and braced his fall with both hands. [Noch] hit the back of his head as he continued to fall backwards.

The ACI form also stated that once Noch had been cuffed and escorted outside, "[Noch] apologized multiple times to me" and said that "he did not mean to threaten nurses or anyone else at the hospital."

The use of control form contained a similar description of the incident.

### (b) Law Enforcement Interview

On November 2, 2020, the hospital's security consultant reviewed internal reports of the incident involving Noch and Rieker and reviewed the hospital's security video. After doing so, the consultant started an internal investigation into whether Rieker's use of force was appropriate under the hospital's use of force policy.

On November 10, 2020, the private security firm contacted the LPD's chief of police and reported concerns about Rieker's use of force. The chief of police initially referred the matter to LPD's internal affairs division, but after viewing the security video, the chief of police paused the internal affairs investigation and asked the Lancaster County Sheriff's Department to conduct a criminal investigation. On November 18, Deputy Sheriff Jeremy Schwarz was tasked with overseeing the criminal investigation.

Schwarz interviewed Rieker on December 4, 2020. At the beginning of the interview, Schwarz explained that he was investigating Rieker's use of force against Noch. During the interview, Schwarz often referred to statements contained in the ACI form that Rieker completed and, in responding to Schwarz' questions, Rieker generally described events the same way he had when completing the ACI form. In addition, Rieker explained that it was his plan on October 31 to escort Noch out the ambulance bay doors by "herding" him using open hands. But when he saw Noch bring his right fist up, Rieker responded by stepping forward and using a "stiff arm" to push Noch back. Rieker described the contact as a "shove" backward and "not an open palm strike to the sternum." Rieker said his intent in shoving Noch was to "create space" so Noch could not punch him. After commenting that he assumed Schwarz had "seen the video," Rieker said that although he "used two hands" to push Noch, "the power was from the left arm, the other arm was sort of just out." Rieker also commented that although he had been "second-guessing" himself, it was his perception that Noch raised his arm up "maybe 1 to 4 inches" and that movement, combined with Noch's threats, made Rieker think that Noch was going to punch him. Schwarz asked Rieker if there was anything in his ACI form that was "misleading" or "not truthful," and he replied, "No."

### 3. Criminal Charges and Motion to Suppress

On February 3, 2021, the State filed a complaint in the county court for Lancaster County charging Rieker with two misdemeanors: assault in the third degree[1] and false reporting.[2] The complaint alleged the assault occurred on or about October 31, 2020, and the false reporting occurred between October 31 and December 4. Rieker entered pleas of not guilty.

---

[1] See Neb. Rev. Stat. § 28-310(1) (Reissue 2016).

[2] See Neb. Rev. Stat. § 28-907(1) (Reissue 2016).

Thereafter, Rieker moved to suppress the ACI form he completed on November 5, 2020, and the statements he made to Schwarz in his December 4 interview. The legal basis of the suppression motion was a claim that Rieker's statements were involuntary under *Garrity v. New Jersey*.[3] In that case, the U.S. Supreme Court held that an employee cannot be coerced into waiving the right to self-incrimination by the threat of termination.[4] We addressed the *Garrity* rule in *State v. Weichman*[5] and adopted a two-part test that has both a subjective and objective component:

> [T]he defendant [must] have a subjective belief that he or she was compelled to give a statement on threat of the loss of his or her job and . . . the defendant's belief [must] be objectively reasonable. A subjective belief that *Garrity* applies will not be considered objectively reasonable if the state has played no role in creating the impression that the refusal to give the statement will be met with termination of employment. The existence of a statute, rule, regulation, or policy subjecting an employee to termination for the failure to provide a statement is highly relevant, though not usually dispositive, in determining whether a subjective belief is objectively reasonable. Under this test, a court examines the totality of the circumstances surrounding the statement.

The county court initially suppressed the ACI form under *Garrity* and *Weichman*.[6] But the State filed an interlocutory appeal of that suppression ruling,[7] and the district court

---

[3] *Garrity v. New Jersey*, 385 U.S. 493, 87 S. Ct. 616, 17 L. Ed. 2d 562 (1967).

[4] See, *id*.; *Gardner v. Broderick*, 392 U.S. 273, 88 S. Ct. 1913, 20 L. Ed. 2d 1082 (1968). See, also, *Lefkowitz v. Cunningham*, 431 U.S. 801, 97 S. Ct. 2132, 53 L. Ed. 2d 1 (1977); *Lefkowitz v. Turley*, 414 U.S. 70, 94 S. Ct. 316, 38 L. Ed. 2d 274 (1973).

[5] *State v. Weichman*, 292 Neb. 227, 234, 871 N.W.2d 768, 774-75 (2015).

[6] See, *Garrity, supra* note 3; *Weichman, supra* note 5.

[7] See Neb. Rev. Stat. § 29-824(3) (Reissue 2016).

reversed the ruling. In doing so, the district court concluded Rieker had not met his burden of proof under *Weichman*, and it cited various cases from other jurisdictions holding that *Garrity* did not apply under similar circumstances.[8]

### 4. Bench Trial and Affirmative Defenses

The matter proceeded to a bench trial, and the evidence described above was adduced. When the ACI form and the interview with Schwarz were offered by the State, Rieker renewed his objections under *Garrity*; the county court overruled the objections and received the exhibits.

At trial, Rieker did not deny causing bodily injury to Noch on October 31, 2020, but he raised the affirmative defense that his use of force was justified because he was acting either in self-defense,[9] in defense of others,[10] or in defense of property.[11]

After the State rested its case in chief, Rieker moved for a judgment of acquittal on both counts. In support of acquittal on the assault charge, Rieker argued the State had not met its burden of disproving that his use of force was justified. And in support of acquittal on the false reporting charge, Rieker argued that because he furnished the ACI form to LPD before the criminal investigation was opened, any false information in the ACI form could not have impeded the investigation

---

[8] See, *U.S. v. Smith*, 821 F.3d 1293 (11th Cir. 2016); *U.S. v. Cook*, 526 F. Supp. 2d 1 (D.D.C. 2007); *Watson v. County of Riverside*, 976 F. Supp. 951 (C.D. Cal. 1997).

[9] See Neb. Rev. Stat. § 28-1409 (Reissue 2016) (use of force is justifiable when actor believes it is immediately necessary to protect actor from use of unlawful force by other).

[10] See Neb. Rev. Stat. § 28-1410 (Reissue 2016) (use of force is justifiable to protect third person when actor would be justified in using such force to protect actor against injury he or she believes to be threatened to third person).

[11] See Neb. Rev. Stat. § 28-1411 (Reissue 2016) (use of force is justifiable if actor believes it is "immediately necessary . . . [t]o prevent or terminate an unlawful entry or other trespass upon land").

of an actual criminal matter. The county court overruled the motion for judgment of acquittal, and the defense put on evidence. At the close of all the evidence, the court heard arguments and took the matter under advisement.

On November 8, 2022, the county court entered an order finding Rieker guilty of third degree assault and false reporting. The order did not include any express factual findings or credibility determinations. The court requested the preparation of a presentence investigation report and set the matter for sentencing.

## 5. Motion for New Trial and Sentencing

Rieker filed a timely motion for new trial, generally asserting that neither conviction was supported by the evidence. The county court overruled the motion and proceeded with sentencing.

Rieker was sentenced to concurrent terms of 18 months' probation for each conviction. He timely appealed to the district court.

## 6. District Court Affirms

As relevant to the instant appeal, Rieker assigned and argued in the district court that (1) the evidence was insufficient to support his convictions and (2) his motion to suppress the ACI form should have been granted. The district court found no merit to either assignment and affirmed his convictions and sentences.

Rieker filed this timely appeal, and we granted his petition to bypass the Nebraska Court of Appeals.

## II. ASSIGNMENTS OF ERROR

Rieker assigns, restated and consolidated, that the district court erred in (1) affirming the denial of his motion to suppress the ACI form and (2) finding there was sufficient evidence to support his convictions.

## III. STANDARD OF REVIEW

[1] In reviewing a motion to suppress based on the claimed involuntariness of a statement, an appellate court applies a two-part standard of review.[12] With regard to historical facts, we review the trial court's findings for clear error.[13] Whether those facts suffice to meet the constitutional standards, however, is a question of law, which we review independently of the trial court's determination.[14]

[2-4] In an appeal of a criminal case from the county court, the district court sits as an intermediate court of appeals.[15] Both the district court and a higher appellate court generally review appeals from the county court for error appearing on the record.[16] When reviewing a judgment for errors appearing on the record, an appellate court's inquiry is whether the decision conforms to the law, is supported by competent evidence, and is neither arbitrary, capricious, nor unreasonable.[17]

[5,6] In considering a claim of insufficient evidence, an appellate court will not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence.[18] Such matters are for the finder of fact.[19] Absent prejudicial error, a conviction will generally be affirmed so long as the evidence admitted at trial, viewed and construed most favorably to the State, is sufficient to support the elements of conviction beyond a reasonable doubt.[20]

---

[12] See *Weichman, supra* note 5.

[13] *Id*.

[14] *Id*.

[15] *State v. Grant*, 310 Neb. 700, 968 N.W.2d 837 (2022).

[16] *Id*.

[17] *Id*.

[18] *Id*.

[19] *Id*.

[20] *Id*.

## IV. ANALYSIS

We address Rieker's second assignment of error first because we find it is dispositive. In his second assignment, Rieker argues that neither conviction was supported by sufficient evidence. We address each conviction in turn, and ultimately conclude this assignment of error has no merit.

### 1. Third Degree Assault

Third degree assault occurs when a person "[i]ntentionally, knowingly, or recklessly causes bodily injury to another person."[21] At trial, Rieker did not dispute that he intentionally caused bodily injury to Noch, but he argued that his actions were justified by either self-defense, defense of others, or defense of property. On appeal to this court, he no longer asserts that his actions were justified by self-defense or defense of others. Instead, he relies exclusively on the affirmative defense of defense of property under § 28-1411, and he argues the evidence was insufficient to disprove that affirmative defense. We limit our analysis accordingly.

Section 28-1411 provides, in relevant part:

   (1) . . . [T]he use of force upon or toward the person of another is justifiable when the actor believes that such force is immediately necessary:

   (a) To prevent or terminate an unlawful entry or other trespass upon land . . . ; *Provided*, that such land . . . is, or is believed by the actor to be, in his possession or in the possession of another person for whose protection he acts[;]

      . . . .

   (3) The use of force is justifiable under this section only if the actor first requests the person against whom such force is used to desist from his interference with the property, unless the actor believes that:

   (a) Such request would be useless;

---

[21] § 28-310(1)(a).

(b) It would be dangerous to himself or another person to make the request; or

(c) Substantial harm will be done to the physical condition of the property which is sought to be protected before the request can effectively be made.

(4) The use of force to prevent or terminate a trespass is not justifiable under this section if the actor knows that the exclusion of the trespasser will expose him to substantial danger of serious bodily harm.

[7] In construing similar language in another criminal statute justifying the use of force, we have consistently held that a defendant "must have a reasonable and good faith belief in the necessity of using force and the force used in defense must be immediately necessary and justified under the circumstances."[22] It is not enough that the defendant subjectively believed in the need to use force; the defendant must produce evidence that this subjective belief was also objectively reasonable.[23] We hold it is appropriate to apply these same principles to justification claims under § 28-1411.

[8-10] On appeal, Rieker argues the evidence was insufficient to support his conviction for third degree assault because the State failed to disprove his affirmative defense of defense of property. Nebraska has adopted the rule that in the absence of a statute placing the burden of proving an affirmative defense on the defendant in a criminal case, the nature of an affirmative defense is such that the defendant has the initial burden of going forward with evidence of the defense, and once the defendant has produced sufficient evidence to raise the defense, the issue becomes one which the State

---

[22] *State v. Johnson*, 314 Neb. 20, 42-43, 988 N.W.2d 159, 176 (2023) (construing § 28-1409). Accord *State v. Allen*, 314 Neb. 663, 681, 992 N.W.2d 712, 727 (2023) ("[w]e have repeatedly stated that to successfully assert the claim of self-defense [under § 28-1409], one must have a reasonable and good faith belief in the necessity of using force"), *modified on denial of rehearing* 315 Neb. 255, 995 N.W.2d 446.

[23] See *Johnson, supra* note 22.

must disprove.[24] The evidence necessary to raise an affirmative defense may be adduced either by the defendant's witnesses or in the State's case in chief without the necessity of the defendant's presenting evidence.[25] A defendant need only adduce a slight amount of evidence to satisfy the initial burden of raising an affirmative defense.[26] Once an affirmative defense has been successfully raised, disproving that affirmative defense becomes the last element the State is required to prove beyond a reasonable doubt.[27]

The State does not dispute that Rieker satisfied his initial burden to raise the affirmative defense of defense of property, and we therefore do not address that issue. Instead, we focus on whether the evidence at trial was sufficient to prove beyond a reasonable doubt that Rieker's use of force was not justified under § 28-1411.

[11,12] To the extent Rieker's briefing on appeal can be read to suggest that the county court should have made an express finding on this justification defense, we disagree. The county court's rejection of the justification defense was implicit in its conclusion that Rieker was guilty of third degree assault, and although the county court did not make express factual findings as to any of the essential elements, it did not need to do so. A trial judge sitting without a jury is not required to articulate findings of fact or conclusions of law in criminal cases.[28] Instead, it is presumed in a criminal bench trial that the judge is familiar with and applied the

---

[24] See *State v. Grutell*, 305 Neb. 843, 943 N.W.2d 258 (2020).

[25] See *id*.

[26] *Id*.

[27] See *State v. Warren*, 9 Neb. App. 60, 608 N.W.2d 617 (2000) (holding when affirmative defense has been raised, disproof of such must be listed as final element in jury instruction listing elements state must prove beyond reasonable doubt). Accord NJI2d Crim. 7.5, comment ("[w]hen defense of property is at issue, the last element of the elements instruction will be 'that the defendant did not act in defense of his property'").

[28] *State v. Vanderford*, 312 Neb. 580, 980 N.W.2d 397 (2022).

proper rules of law, unless it clearly appears otherwise.[29] And an appellate court will sustain a conviction in a bench trial of a criminal case if the properly admitted evidence, viewed and construed most favorably to the State, is sufficient to support that conviction.[30]

[13] Under § 28-1411, Rieker would have been justified in using force to protect property if he (1) reasonably believed the property was in his possession or in the possession of another for whose protection he was acting; (2) reasonably believed that the force used against Noch was immediately necessary to prevent or terminate an unlawful entry or trespass on the property; (3) first asked Noch to desist from interfering with the property, unless Rieker had a reasonable belief that asking first would be useless, dangerous, or result in substantial property damage; and (4) did not know that using force to exclude Noch would expose Noch to a substantial danger of bodily harm.[31] All four elements must be established for the defense to apply.[32] As such, the State could meet its burden of disproving this affirmative defense by disproving one or more of the material elements.

Without expressing an opinion on whether the other three elements of defense of property were established or disproved on this record, we focus on the second element: whether Rieker reasonably believed the force used was immediately necessary to prevent a trespass. Regarding this element, Rieker's appellate brief seems to suggest that because Noch was refusing Rieker's requests to leave the hospital through the ambulance bay exit, Noch was a trespasser, and Rieker

---

[29] See *State v. Cowan*, 204 Neb. 708, 285 N.W.2d 113 (1979).

[30] *State v. Dap*, 315 Neb. 466, 997 N.W.2d 363 (2023).

[31] See NJI2d Crim. 7.5. See, also, *State v. Cole*, 231 Neb. 420, 436 N.W.2d 209 (1989) (holding trial court properly refused defense of property instruction where evidence showed that force was not immediately necessary and no request was made to desist before force was used).

[32] See *id.*

was therefore justified in using any nonlethal force against him. But under § 28-1411(1)(a), a defendant must reasonably believe that the force used against the victim was "immediately necessary" to "prevent or terminate an unlawful entry or other trespass upon land."

The evidence adduced at trial, viewed in the light most favorable to the State, supports a finding that Rieker could not have reasonably believed that the force he used was immediately necessary to prevent or terminate a trespass. We express no opinion on whether Noch could be considered a trespasser on these facts, but instead observe that Rieker did not testify that he believed Noch to be trespassing at any point during the encounter. To the contrary, Rieker admitted that when he encountered Noch in the hallway, Noch was "leaving voluntarily" and "wasn't being removed from the property." The security video and eyewitness testimony support a finding that Noch was in the process of leaving the hospital through the main lobby exit when Rieker stopped him and directed him to use a different exit. As such, although it is undisputed that Noch refused to leave through the specific exit that Rieker directed him to use, Noch was not refusing to leave the hospital altogether and instead was demanding to leave through a different, nearby exit. A rational fact finder could conclude from this evidence that Rieker could not have reasonably believed it was immediately necessary to use force against Noch to either prevent or terminate a trespass.

On this record, there is no merit to Rieker's argument that the evidence was insufficient to find that the State met its burden to disprove the affirmative defense of defense of property. His arguments to the contrary are without merit.

### 2. False Reporting

Rieker also argues on appeal that the evidence was insufficient to support his conviction for making a false report. To analyze his arguments, we first review the essential elements of the crime of false reporting under § 28-907(1)(a).

In the 1985 case *State v. Ewing*,[33] we stated that a conviction for false reporting under § 28-907(1)(a) (Cum. Supp. 1984) has three elements: (1) the defendant must have made a false statement to a peace officer, (2) the false statement must have been made with the intent to impede an investigation, and (3) the investigation must be of an actual criminal matter. Since *Ewing*, some appellate opinions have repeated these three elements,[34] while others have recited the specific statutory language of § 28-907.[35]

We take this opportunity to clarify any inconsistency in our case law as to the essential elements of § 28-907(1)(a). In doing so, we note that the statute has been amended since our decision in *Ewing*,[36] and it currently provides that a person commits the offense of false reporting if he or she "[f]urnishes material information he or she knows to be false to any peace officer or other official with the intent to instigate an investigation of an alleged criminal matter or to impede the investigation of an actual criminal matter."[37] The 1994 amendment added the requirement that the information furnished must be "material," and the elements described in *Ewing* did not account for that language.

[14] We now clarify, based on the plain language of § 28-907(1)(a), that the elements the State must prove beyond a reasonable doubt to convict a defendant of false reporting

---

[33] *State v. Ewing*, 221 Neb. 462, 378 N.W.2d 158 (1985).

[34] See, *State v. Hird*, 239 Neb. 331, 476 N.W.2d 229 (1991); *State v. Gonzales*, 224 Neb. 659, 399 N.W.2d 832 (1987).

[35] See, *State v. Covey*, 290 Neb. 257, 859 N.W.2d 558 (2015); *In re Interest of McManaman*, 222 Neb. 263, 383 N.W.2d 45 (1986), *disapproved on other grounds, In re Interest of K.M.*, 299 Neb. 636, 910 N.W.2d 82 (2018); *State v. Halligan*, 20 Neb. App. 87, 818 N.W.2d 650 (2012); *In re Interest of Genevieve C.*, 13 Neb. App. 665, 698 N.W.2d 462 (2005).

[36] See 1994 Neb. Laws, L.B. 907. See, also, § 28-907(1)(a) (Cum. Supp. 1994).

[37] § 28-907(1)(a) (Reissue 2016).

are: (1) The defendant furnished material information to a peace officer or other official, (2) the defendant did so knowing the information to be false, and (3) the defendant did so with the intent to either (a) instigate the investigation of an alleged criminal matter or (b) impede the investigation of an actual criminal matter.[38]

[15] Our cases have repeatedly emphasized that "the purpose of § 28-907(1)(a) is to prevent the public from willfully furnishing erroneous information to law enforcement officers and thus interfering with the performance of their duties."[39] With this purpose and the material elements of the crime in mind, we examine the evidence in the light most favorable to the State to determine whether it was sufficient to support Rieker's conviction for false reporting. But first, we identify the information that the State claimed was false.

At trial, the State generally relied on two exhibits as the source of the false information: the ACI form that Rieker completed in early November 2020 and statements that Rieker made to Schwarz during the December 4, 2020, interview. In both the ACI form and the subsequent interview with Schwarz, Rieker generally characterized Noch as the initial aggressor, characterized his use of force against Noch as merely a "'stiff arm,'" and indicated Noch fell because he slipped on the tile. More specifically, Rieker stated that during the encounter, Noch stated, "'I'll fucking hit you'" and "'I'll fight you'" and that Noch "clenched his fists" and "started to bring his right hand upwards in a rapid manner," leading Rieker to believe Noch was going to punch him. In response, Rieker stated he "used my left arm to 'stiff arm' [Noch] away from me with an open palm, while keeping my

---

[38] See *Halligan, supra* note 35.

[39] *Nebraska Legislature on behalf of State v. Hergert*, 271 Neb. 976, 1007, 720 N.W.2d 372, 397 (2006) (internal quotation marks omitted). See, *In re Interest of McManaman, supra* note 35; *Ewing, supra* note 33.

right arm extended and bladed to keep [Noch] from accessing my gun." And Rieker stated the "'stiff arm'" caused Noch to take "several steps back" and then "slip[] on the tile, as he was only wearing socks."

In affirming Rieker's conviction for false reporting, we understand the district court to have focused on the information described above, and the parties do not dispute that this is the information we should consider when analyzing the sufficiency of the evidence to support the false reporting conviction.

The State generally argues that the video evidence and the testimony of eyewitnesses proved that Rieker knew this information was false, that the information was material to the use of force investigation, and that Rieker furnished the false information to law enforcement with the intent to impede the investigation of an actual criminal matter. On appeal to this court, no one contests that the information in both the ACI form and the Schwarz interview was furnished to a peace officer, so, in the sections that follow, we address whether the evidence was sufficient to prove that (1) the information was material, (2) Rieker knew the information to be false, and (3) Rieker's intent was to impede the investigation of an actual criminal matter.

(a) Material Information

[16,17] We have not directly addressed the proper interpretation of the term "material" as used in § 28-907(1)(a). Generally, the "materiality" of evidence depends upon the relationship between the proposition for which it is being considered and the issues presented; evidence related to a matter not in issue is immaterial.[40] When interpreting a similar statute, the U.S. Supreme Court has defined a "material" fact as one that has a "'natural tendency to influence, or [be] capable of influencing, the decision of the decisionmaking body to

---

[40] See, e.g., *State v. Bell*, 242 Neb. 138, 493 N.W.2d 339 (1992) (discussing concepts of materiality and probative value in relation to relevant evidence).

which it was addressed.'"[41] Similarly, the Eighth Circuit, in the context of perjury charges, has held that a statement is considered material if it is "'material to any proper matter of inquiry'" and "'"tend[s] to impede or hamper the course of the investigation."'"[42] For many years, Nebraska appellate courts have applied similar definitions and principles when the question presented was the materiality of a statement.[43] We now hold that for purposes of § 28-907(1)(a), information is material if it has a natural tendency to influence, or is capable of influencing, any proper matter of inquiry in a criminal investigation.

Based on these principles, a reasonable finder of fact could conclude beyond a reasonable doubt that the information furnished by Rieker in the ACI form and the Schwarz interview was material. This is so because both at the time the ACI form was completed and at the time of the interview, the underlying issue was whether Rieker's use of force was justified and/or excessive, and the information furnished by Rieker directly related to how much force he used and why. As such, there is sufficient evidence in the record to support a finding that the allegedly false information furnished in both the ACI form and the Schwarz interview was material.

---

[41] *United States v. Gaudin*, 515 U.S. 506, 509, 115 S. Ct. 2310, 132 L. Ed. 2d 444 (1995) (interpreting 18 U.S.C. § 1001 (2018) that criminalizes knowingly and willfully falsifying, concealing, or covering up "a material fact" in any matter within jurisdiction of department or agency of United States).

[42] *U.S. v. Blanton*, 281 F.3d 771, 775 (8th Cir. 2002) (interpreting 18 U.S.C. § 1623(a) (2018) that criminalizes making of "false material declaration" under oath).

[43] See, *State v. Childs*, 309 Neb. 427, 960 N.W.2d 585 (2021) (finding declarant's statements that she and husband did not dig trench in ditch were material when made at trial where husband charged with injury to public road); *Shevalier v. State*, 85 Neb. 366, 123 N.W. 424 (1909) (finding false statements about contents of estate not material when only issue before court was setting of time and place for proving will of deceased).

(b) Information Known to Be False

To prove the crime of false reporting under § 28-907(1)(a), the State must prove that the information was "know[n by the defendant] to be false."[44] On appeal to this court, we do not understand Rieker to dispute that this element was established beyond a reasonable doubt, but to the extent he does, we find that the evidence was sufficient.

[18] Our prior false reporting cases have not directly addressed how this element may be proved, but we find guidance in our case law analyzing similar statutes. Neb. Rev. Stat. § 28-915.01 (Cum. Supp. 2024) prohibits making a "false statement under oath" when the declarant "does not believe the statement to be true." In *State v. McCaslin*,[45] we explained:

> It is up to the jury to decide whether the defendant believed in the truth of his or her testimony when uttered. The knowledge of falsity may be inferred by the trier of fact from the surrounding circumstances, and such an inference may be derived from several sources: the objective falsity itself, a motive to lie, or facts tending to show generally that defendant knew his or her affirmation was false. Objective falsity as proof of knowledge arises when actual falsity is established and defendant's awareness of it is inescapable and self-evident. . . . Proof of the falsity of a response may circumstantially imply knowledge that such was untrue when uttered.

Applying similar reasoning here, we conclude that a reasonable trier of fact could infer from the objective video evidence, and from eyewitness testimony about the circumstances surrounding the use of force, that Rieker knew he was providing false information about why he used force against Noch and the nature of the force he used. This includes evidence that immediately after the assault, Rieker attempted, unsuccessfully, to persuade Noch to agree with Rieker's characterization

---

[44] § 28-907(1)(a).

[45] *State v. McCaslin*, 240 Neb. 482, 489-90, 482 N.W.2d 558, 564 (1992).

of events. Viewed in the light most favorable to the State, this evidence was sufficient to show that Rieker knew the information he was providing law enforcement was false.

### (c) Intent to Impede Investigation of Actual Criminal Matter

[19,20] We have held that the phrase "the investigation of an actual criminal matter" as used in § 28-907(1)(a) requires that there be a legitimate and valid investigation of facts that could constitute a predicate criminal offense.[46] The word "actual," we have explained, adds "an element of objectivity to ensure that before a person is questioned concerning a criminal matter, the police must be able to point to particular facts and circumstances which would lead a reasonable person to believe that criminal activity was afoot."[47] But we have also explained that for § 28-907(1)(a) to apply, there need not be "an actual crime committed."[48]

[21] The requisite intent to impede an investigation under § 28-907(1)(a) can be proved through circumstantial evidence, and the intent with which an act is done is inferable from the act itself and from the facts and circumstances surrounding it.[49] But so long as an actual criminal matter is at issue, one need not actually impede the criminal investigation into that matter to be guilty of false reporting.[50]

In arguing the State failed to prove that he acted with the intent to impede an investigation into an actual criminal matter, Rieker does not dispute there was a criminal assault investigation underway by the time he was interviewed by Schwarz on December 4, 2020. But he contends that when he completed the ACI form in November, there was no criminal

---

[46] *Ewing, supra* note 33.

[47] *Id.* at 468, 378 N.W.2d at 162-63.

[48] *Id.* at 468, 378 N.W.2d at 162.

[49] See *Ewing, supra* note 33.

[50] See *Gonzales, supra* note 34.

investigation, and that the ACI form was "an internal law enforcement document used to formally memorialize information that may, or may not, relate to criminal activity."[51] He thus argues that any false information furnished in the ACI form cannot be relied upon to satisfy the element that he intended to impede the investigation of an actual criminal matter.

Rieker made a similar argument on appeal before the district court, and the district court concluded it was unnecessary to decide whether statements in the ACI form were intended to impede the investigation of an actual criminal matter. That was so, the district court reasoned, because Rieker furnished nearly identical information to Schwarz during the criminal investigation and such information was sufficient, on its own, to satisfy this element. We agree, and likewise find it unnecessary, in this case, to address whether false statements furnished in the ACI form can support a conviction for false reporting under § 28-907(1)(a). Moreover, we agree with the district court that, even if we consider only the false information furnished in the December 4, 2020, interview with Schwarz, the record still contains ample evidence that Rieker's intent was to impede the investigation of an actual criminal matter.

In that regard, it is undisputed that when Rieker repeated his false statements to Schwarz, there was an ongoing criminal assault investigation focused on Rieker's use of force against Noch. And we find sufficient evidence in the record to support a finding that Rieker, motivated by a desire to avoid criminal charges, furnished false information to Schwarz during that interview with the intent to impede the criminal investigation by mischaracterizing Noch as the aggressor and mischaracterizing Rieker's use of force as both minimal and justified.

### (d) Summary

Viewed in the light most favorable to the State, the record in this case is sufficient to establish that during his interview with Schwarz, Rieker furnished material information to a

---

[51] Brief for appellant at 35.

peace officer or other official, that he did so knowing the information to be false, and that he did so with the intent to impede the investigation of an actual criminal matter. We therefore affirm Rieker's conviction for false reporting.

### 3. MOTION TO SUPPRESS

Rieker also assigns and argues that the district court erred on interlocutory appeal when it reversed the county court's initial order suppressing the ACI form, and he further argues the district court erred on direct appeal when it found no error in the trial court's admission of the ACI form at trial. We conclude it is not necessary to analyze this assignment of error,[52] because even assuming without deciding that the ACI form was inadmissible, such error was harmless on this record.

[22,23] It is well-settled that in a criminal case, the improper admission of evidence is harmless beyond a reasonable doubt when the evidence is cumulative and there is other competent evidence to support the conviction.[53] Here, the false information Rieker provided in the ACI form was nearly identical to the false information Rieker furnished to Schwarz during the interview on December 4, 2020. Rieker makes no argument on appeal that evidence of the Schwarz interview was improperly admitted. And in a bench trial of a criminal action, if the properly admitted evidence supports the conviction, an appellate court will affirm unless the appellant shows the trial court actually resolved a factual issue based upon improperly admitted evidence.[54] No such showing can be made here, and

---

[52] See, e.g., *Ronnfeldt Farms v. Arp*, 317 Neb. 690, 11 N.W.3d 371 (2024) (appellate court not obligated to engage in analysis not necessary to adjudicate case before it).

[53] See *State v. Matteson*, 313 Neb. 435, 985 N.W.2d 1 (2023). Accord *State v. Grant*, 293 Neb. 163, 876 N.W.2d 639 (2016) (where evidence is cumulative and conviction is supported by other competent evidence, improper admission or exclusion of evidence is harmless beyond reasonable doubt).

[54] See *State v. Lara*, 258 Neb. 996, 607 N.W.2d 487 (2000).

there is thus no need to resolve Rieker's assignment challenging the ruling on his motion to suppress the ACI form.[55]

## V. CONCLUSION

For the foregoing reasons, we affirm Rieker's convictions and sentences.

AFFIRMED.

HEAVICAN, C.J., not participating.

---

[55] See *Ronnfeldt Farms, supra* note 52.